FILED
United States Court of Appeals
Tenth Circuit

September 26, 2018

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

NOEL TYLER, as interim director of the
Oklahoma Department of Rehabilitation
Services,

        Plaintiff Counter Defendant -
        Appellant,

v.

UNITED STATES DEPARTMENT OF
EDUCATION REHABILITATION
SERVICES ADMINISTRATION,

        Defendant - Appellee,

and

DAVID ALTSTATT, SR.,

        Intervenor Defendant
        Counterclaimant - Appellee.

No. 17-6074

_____

**Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. 5:16-CV-00137-W)**
_____

Peter A. Nolan, Winstead PC, Austin, Texas (Richard Olderbak, Oklahoma Office of
Attorney General, Department of Rehabilitation Services, Oklahoma City, Oklahoma,
with him on the briefs), for Plaintiff-Appellant.

Kay Sewell, Assistant United States Attorney, Oklahoma City, Oklahoma (Robert J.
Troester, Acting United States Attorney, Chad A. Readler, Acting Assistant Attorney
General, Mark B. Stern and Laura E. Myron, Attorneys, Appellate Staff, United States

Department of Justice, Washington, D.C., with her on the briefs), for Defendant-Appellee.

Kevin R. Donelson, (Anh Kim Tran with him on the briefs), Fellers, Snider, Blankenship, Bailey & Tippens, P.C., Oklahoma City, Oklahoma, for Intervenor Defendant Counterclaimant-Appellee.

_____

Before **MATHESON**, **McHUGH**, and **EID**, Circuit Judges.

_____

**MATHESON**, Circuit Judge.

_____

The Oklahoma Department of Rehabilitation Services ("ODRS") appeals from the district court's affirmance of an arbitration decision rendered under the Randolph-Sheppard Act (the "RSA"), 20 U.S.C. §§ 107 *et seq.* The statute authorizes designated state agencies such as ODRS to license and assign blind vendors to operate vending facilities on federal property. It establishes an arbitration scheme to resolve disputes arising from this program.

In accordance with the statute, the Department of Education ("DOE") convened an arbitration panel (the "Panel") to hear the grievances of David Altstatt, a blind vendor, challenging ODRS's selection of another blind vendor, Robert Brown, for a particular vending assignment. Both Mr. Altstatt and Mr. Brown had applied for the assignment. The Panel found for Mr. Altstatt and ordered ODRS to remove Mr. Brown from the disputed assignment, appoint Mr. Altstatt in Mr. Brown's place, and pay damages and attorney fees to Mr. Altstatt.

ODRS brought suit in district court against DOE, seeking to vacate the Panel's decision, which the Randolph-Sheppard Act subjects to judicial review as a final agency

2

action under the Administrative Procedure Act (the "APA"), 5 U.S.C. §§ 551 *et seq.* Mr. Altstatt intervened as a defendant and counterclaimant, requesting that the court affirm the arbitration decision. DOE participated in the litigation only to the extent of filing the administrative record of the Panel proceedings. The district court entered judgment in favor of Mr. Altstatt and ordered ODRS to comply with the Panel's decision. ODRS now appeals.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm the district court's decision as to the Panel's award of injunctive relief in the form of Mr. Brown's removal and Mr. Altstatt's appointment to the disputed assignment, but we reverse as to the Panel's award of damages and attorney fees.

## I. BACKGROUND

This section provides background on: (A) the RSA, (B) Mr. Altstatt's grievances against ODRS, (C) the Panel's decision in favor of Mr. Altstatt, and (D) the federal district court proceedings.

### A. *The Randolph-Sheppard Act*

The RSA, 20 U.S.C. §§ 107 *et seq.*, enacted in 1936 and amended in 1954 and 1974, established a federal program (the "RSA Program") to enhance blind individuals' economic opportunities by granting them priority to operate vending facilities on federal property. States participate in the RSA Program through state licensing agencies ("SLAs") designated by the DOE, which administers the RSA. *Id.* §§ 107a(a), 107(b). SLAs promulgate and implement policies and standards, which DOE must approve,

governing the licensure and selection of blind vendors to operate vending facilities on federal property. 34 C.F.R. § 395.4; *see also id.* § 395.3(a)(7).

As amended in 1974, the RSA establishes a two-tiered scheme for resolving blind vendors' grievances arising from SLAs' operation of the RSA program. First, SLAs must hear and render a decision on a blind vendor's grievance. 20 U.S.C. § 107d-1(a). Second, a vendor who is dissatisfied with the SLA's decision may then request arbitration by a panel convened by DOE. *Id.* RSA arbitration decisions are subject to judicial review in federal court as final agency actions under the APA. *Id.* § 107d-2.

## B. *Mr. Altstatt's Grievances against ODRS*

ODRS, Oklahoma's designated licensing agency, issues licenses to blind vendors and assigns them to manage vending contracts with the federal government. *See* Okla. Admin. Code § 612:25-4-1(a). In late 2012, ODRS initiated a selection process for a licensed blind vendor to assume the management of the Fort Sill vending contract (the "Contract") with the Army. It solicited applications through a position announcement (the "Announcement"), which enumerated "eligibility criteria specific to this announcement." App., Vol. 7 at 1135, 1139. To be eligible, the applicant must not "have had any delinquency on taxes for the past 3 years." *Id.* at 1139. In accordance with its regulations, Okla. Admin. Code §§ 612:25-4-57, 612:25-4-59, ODRS convened a selection committee (the "Committee") to interview the candidates, evaluate their applications, and make a recommendation for the Contract assignment. The Committee recommended Mr. Brown over the other candidates, which included Mr. Altstatt. ODRS

4

accepted the Committee's recommendation and selected Mr. Brown to manage the Contract.

After Mr. Brown's selection, Mr. Altstatt filed a grievance with ODRS, complaining about the Committee's selection procedures. He argued that Mr. Brown's selection was null and void because the Committee had not considered a required scoring factor under ODRS's regulations.[1] ODRS, after a full evidentiary hearing, ordered the Committee to reconvene within 30 days to consider the previously omitted factor. In the meantime, ODRS appointed Mr. Brown as the interim Contract manager so that he could begin preparations to operate Fort Sill's vending facility. ODRS also assigned each candidate a score for the previously omitted factor based on the available data and provided this information to the Committee. The reconvened Committee considered the additional scores and again recommended Mr. Brown for the Contract assignment. ODRS again accepted the Committee's recommendation.

Following ODRS's interim appointment of Mr. Brown and again after ODRS's permanent re-selection of Mr. Brown, Mr. Altstatt filed grievances with ODRS to challenge these actions. He complained, among other things, that (1) ODRS's re-selection process was "infirm," App., Vol. 7 at 1227, (2) one of the Committee

---

[1] At the relevant time, ODRS regulations provided that selection committees' scoring of applicants "shall be based on" four "factors," one of which was called "[m]onthly location reviews and annual evaluation." Okla. Admin. Code § 612:25-4-59 (2012). Mr. Altstatt complained—and ODRS does not dispute—that the Committee failed to consider the "monthly location reviews and annual evaluation" factor. ODRS has instead defended the omission of this factor by offering evidence to show that "data was [not] available for [this factor] at the time that the . . . Committee needed to conduct th[e] selection process." Aplt. Br. at 10 (citing App., Vol. 6 at 1053-58).

5

members—Charles Pride—was biased, and (3) Mr. Brown was ineligible for the Contract assignment because he was delinquent on his taxes. Mr. Altstatt also filed a complaint with DOE to request arbitration of his grievances against ODRS.

ODRS granted Mr. Altstatt a second full evidentiary hearing. After the hearing, it affirmed Mr. Brown's interim and permanent appointments, concluding that they "complied with the applicable regulations and due process." App., Vol. 4 at 718-19. Dissatisfied with ODRS's decision, Mr. Altstatt filed a second complaint with DOE requesting arbitration of his grievances.

## C. *The Panel's Decision*

In July 2014, DOE notified the parties that it was consolidating Mr. Altstatt's requests for arbitration and "authoriz[ing] the convening of [the Panel] to hear and render a decision on the issues raised in the two complaints." App., Vol. 5 at 766, 768. DOE stated that "[t]he central issue is whether [ODRS]'s process for selecting a blind vendor for the Ft. Sill food service contract violated the *Randolph-Sheppard Act*, implementing regulations and state rules and regulations." *Id.*

In his second complaint to DOE, Mr. Altstatt had specified that he sought the following relief: "that the selection process for the putative winner, Robert Brown, be declared invalid and that Altstatt be awarded the current Contract and profits which he would have received during the period of time in which he would have been operating the Contract from ODRS." App., Vol. 4 at 715. DOE's notices to the parties incorporated this language by reference: "A complete statement of . . . the relief sought is contained in

6

this complaint for arbitration." App., Vol. 5 at 765, 767. The notices did not advise the parties of any limitations on the types of relief the Panel could award.

In January 2016, after a hearing in November at which "[c]ounsel for the parties presented opening statements and then called witnesses to give sworn testimony," the Panel rendered a decision in favor of Mr. Altstatt. App., Vol. 4 at 635, 643. As relevant to this appeal, the Panel concluded that ODRS's re-selection of Mr. Brown for the Contract assignment was invalid because (1) "[ODRS's] utiliz[ation] of the same . . . Committee again after it had violated its own rules deprived Altstatt of due process and was fundamentally unfair," (2) "one of the committee members (Pride) was personal friends with Brown and was known to socialize with him," and (3) "Brown was not eligible [for the Contract assignment] by the clear meaning of the words set forth in the [Announcement]" for having been delinquent in his taxes in the relevant time period. *Id.* at 641-42. The Panel ordered that ODRS remove Mr. Brown from the Contract assignment, appoint Mr. Altstatt in Mr. Brown's place, and pay damages[2] and attorney fees to Mr. Altstatt.

---

[2] The Panel ordered ODRS to pay Mr. Altstatt damages "in an amount equal to Brown's net revenue share during the time that he served as the Interim and Permanent [Contract manager] along with interest at the legal rate." App., Vol. 4 at 643-45. At the arbitration hearing, Mr. Altstatt had called a damages expert to testify. The Panel had rejected the expert's calculations, which were based on the historical financial statements of Mr. Brown's predecessor. Following the Panel's decision, Mr. Altstatt filed a motion requesting the Panel to set a specific amount of damages and to rely on the expert's damages calculations or to order the production of and independently review Mr. Brown's financial statements. App., Vol. 4 at 653-57. The Panel denied this motion, stating that it "set the damages in its original order with parameters sufficient to calculate the amount of damages and has no authority to hear additional evidence or modify said order." *Id.* at 650.

### D. *Federal District Court Proceedings*

ODRS sued DOE in the U.S. District Court for the Western District of Oklahoma, seeking judicial review of the Panel's decision. Mr. Altstatt intervened as a defendant and counterclaimant, requesting that the court affirm the arbitration decision. After filing the administrative record of the Panel proceedings, DOE obtained the parties' stipulation that it "is a nominal defendant in terms of the rights, claims and remedies sought to be reviewed [in the case]." Dist. Ct. Doc. 21 at 4. The court accepted the parties' stipulation and designated DOE a nominal defendant, such that it "[was] not required to participate in any substantive proceedings . . . unless [specifically] directed to do so." *Id.* at 1.[3]

Disallowing any discovery, the court ordered ODRS and Mr. Altstatt to submit briefs on all of the issues. In its brief, ODRS attacked, as arbitrary or capricious and unsupported by substantial evidence, the Panel's following bases for concluding that its permanent selection of Mr. Brown for the Contract assignment was contrary to the RSA: (1) the re-selection process was infirm, (2) Mr. Pride and Mr. Brown were friends at the relevant time, and (3) Mr. Brown was ineligible for the Contract Assignment because of his tax delinquency. ODRS also challenged each type of relief granted by the Panel: (1) the removal of Mr. Brown from the Contract assignment as violating Mr. Brown's due process, (2) the appointment of Mr. Altstatt to the Contract assignment as exceeding

---

[3] Mr. Brown did not seek to intervene in the district court proceedings at any point. After the entry of final judgment, Mr. Brown filed a motion in this court to intervene in ODRS's appeal. We denied this motion as untimely.

the scope of the Panel's remedial authority under the RSA and alternatively as arbitrary or capricious, (3) the damages award as barred by sovereign immunity, and (4) the attorney fee award as exceeding the scope of the Panel's remedial authority under the RSA and alternatively as barred by sovereign immunity.

After receiving briefs from ODRS and Mr. Altstatt on these issues, the district court upheld the Panel's decision in favor of Mr. Altstatt and all relief granted. The court rejected on the merits all but one of ODRS's claims—the due process challenge to the Panel's order to remove Mr. Brown from the Contract assignment. The court determined that ODRS lacked standing to assert the rights of Mr. Brown, a non-party to the litigation, through this claim. The court later entered final judgment, in which it affirmed the "Findings of Fact and Conclusions of Law set forth in the [Panel's decision] . . . in favor of [Mr.] Altstatt." App., Vol. 8 at 1384. It further ordered ODRS to remove Mr. Brown as the Contract manager, replace him with Mr. Altstatt, and pay damages and attorney fees to Mr. Altstatt as provided for in the Panel's decision.

ODRS appealed from the district court's affirmance of the Panel's decision, reasserting all of the arguments it presented below. After oral argument, we ordered the parties, including DOE, to submit supplemental briefs on issues pertaining to sovereign immunity and the scope of the Panel's remedial power under the RSA. DOE attached to its supplemental brief a document titled "Revised Interim Policies and Procedures for Convening and Conducting an Arbitration Pursuant to Sections 5(a) and 6 of the Randolph-Sheppard Act as Amended" ("RSA Arbitration Policies"). This document, which the Commissioner of DOE's Rehabilitation Services Administration approved in

9

1978, establishes the policies and procedures governing the arbitration of blind vendors' grievances against SLAs under the RSA.

## II. **DISCUSSION**

We begin with our standard of review. We then turn to ODRS's various challenges to the Panel's decision, providing additional background as needed.

### A. *Standard of Review*

"We review de novo a district court's decision in an APA case." *Biodiversity Conservation All. v. Jiron*, 762 F.3d 1036, 1059 (10th Cir. 2014). Accordingly, we apply the standards for reviewing final agency actions set forth in the APA:

> To the extent necessary to decision and when presented, the reviewing court *shall decide all relevant questions of law*, *interpret* constitutional and *statutory provisions*, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
>
> . . .
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> (A) *arbitrary*, *capricious*, an abuse of discretion, or otherwise not in accordance with law;
> (B) *contrary to constitutional* right, power, privilege, or *immunity*;
> (C) *in excess of statutory* jurisdiction, *authority*, or limitations, or short of statutory right;
> (D) without observance of procedure required by law; [or]
> (E) *unsupported by substantial evidence* in a case . . . reviewed on the record of an agency hearing provided by statute . . . .

5 U.S.C. § 706 (emphases added).

10

## B. *ODRS's Challenges under the APA*

ODRS raises various APA challenges to (1) the Panel's conclusion that ODRS's permanent selection of Mr. Brown for the Contract assignment violated the RSA, and (2) specific types of relief awarded to Mr. Altstatt, whom the Panel determined should have received the Contract assignment instead of Mr. Brown. We affirm the district court's decision as to the Panel's order to remove Mr. Brown from the Contract assignment and replace him with Mr. Altstatt, but we reverse as to the Panel's award of damages and attorney fees.

We first review the Panel's conclusion that Mr. Brown's selection violated the RSA. ODRS attacks as arbitrary or capricious or as unsupported by substantial evidence the Panel's reasons for this conclusion: infirmity in ODRS's re-selection process, the friendship between Mr. Brown and Mr. Pride, and Mr. Brown's ineligibility. We need only consider ODRS's arguments regarding the Panel's third reason—Mr. Brown's ineligibility for the Contract assignment due to tax issues. Based on our review of the record, we conclude that the Panel's finding of ineligibility was not arbitrary or capricious or unsupported by substantial evidence. Because this reason alone supports the Panel's conclusion that Mr. Brown's selection violated the RSA, we do not consider ODRS's arguments regarding the Panel's remaining reasons.

We then turn to the Panel's remedies awarded to Mr. Altstatt. ODRS challenges: (a) Mr. Altstatt's appointment to the Contract assignment as exceeding the scope of the Panel's remedial authority under the RSA and as arbitrary or capricious; (b) the damages award as violating sovereign immunity; and (c) the attorney fee award as exceeding the

11

scope of the Panel's remedial authority and as violating sovereign immunity.[4]  We

conclude that (a) the Panel had statutory authority to order Mr. Altstatt's appointment to

the Contract; (b) ODRS is entitled to sovereign immunity from the damages award; and

(c) the Panel exceeded its statutory authority in awarding Mr. Altstatt attorney fees.[5]

## 1.  The Panel's Conclusion that ODRS Violated the RSA

Under the APA, the reviewing court must "hold unlawful and set aside agency

action," 5 U.S.C. § 706(2), that is "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law," *id.* § 706(2)(A), or "unsupported by substantial

evidence," *id.* § 706(2)(E).  ODRS contends the Panel's finding that Mr. Brown was

ineligible for the Contract assignment due to tax issues "is not supported by substantial

evidence and is arbitrary."  Aplt. Br. at 40.  We disagree.

---

[4] ODRS also challenges the Panel's removal of Mr. Brown as violating Mr. Brown's due process rights.  *See* Aplt. Br. at 28-31.  We decline to address this claim, which the district court dismissed for lack of standing.  App., Vol. 8 at 1372 n.28 ("Ordinarily a litigant may only assert its own constitutional rights and a plaintiff cannot sue for the deprivation of another's civil rights; the Court therefore has disregarded this argument.").  On appeal, ODRS fails to address its standing to bring the due process claim, both in its opening brief and in its reply brief, even after Mr. Altstatt argued lack of standing in his response brief.  Under these circumstances, ODRS has waived any argument that it has standing to pursue a due process claim on Mr. Brown's behalf, and we therefore do not entertain such a claim.  *See Colorado Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 552 (10th Cir. 2016) ("[T]he plaintiffs don't argue on appeal that [one of the plaintiffs] had standing. . . . Thus, the plaintiffs have waived that argument.").

[5] We do not address ODRS's contention that sovereign immunity bars the attorney fee award because we conclude the RSA does not authorize attorney fees.  We reverse the district court's affirmance of the Panel's attorney fee award on this basis alone.

12

We (a) summarize the evidence before the Panel relating to the tax eligibility requirement for the Contract assignment and Mr. Brown's tax issues; (b) provide legal background on the federal contracting regulations ODRS relies on to challenge the Panel's finding that Mr. Brown was tax delinquent and therefore ineligible for the Contract assignment; and (c) analyze the Panel's finding in light of the administrative record and conclude that the finding was neither unsupported by substantial evidence, nor was it arbitrary or capricious.

a. *Relevant evidence in the administrative record*

We summarize the evidence relating to (i) the Contract assignment's tax eligibility requirement and (ii) Mr. Brown's tax issues in the period leading up to ODRS's selection process.

i. The tax eligibility requirement

The Announcement for the Contract assignment enumerated several "eligibility criteria," including that applicants must not "have had any delinquency on taxes for the past 3 years." App., Vol. 7 at 1139.

The administrative record contains the affidavit of Michael Jones, who served as ODRS's Division Administrator from July 2011 to April 2013. App., Vol. 7 at 1124-25. In his affidavit, Mr. Jones stated that he "wrote the applicant requirements for the [Announcement]." *Id.* at 1124. He stated that "[o]ne of these requirements was that the successful applicant could not have any tax delinquencies" and that he had "included the tax delinquency provision . . . based on requirements found in the Defense Finance Acquisition Regulations, or 'DFARS' that govern all federal contracts." *Id.* at 1124,

13

1125. He also stated that, "if [this requirement] was not met, [it] would be grounds for the federal contracting officer administering [the Contract] to 'debar' or deem the selected manager disqualified from continuing to work at the facility." *Id.* at 1124.

At the arbitration hearing, ODRS called Mike Hamrick, its Operations Coordinator for the RSA Program, to testify. He testified that the tax eligibility requirement is not in ODRS's rules and regulations but instead "comes from the DFARS." App., Vol. 6 at 1049. He also testified that ODRS had not undertaken to check whether the candidates for the Contract assignment satisfied the tax eligibility requirement, "since it w[as] the Army's [rather than ODRS's own] requirement[]." *Id.* at 1050.

### ii. Mr. Brown's tax issues

The administrative record contains notices of two federal tax liens filed against Mr. Brown's property within the three years preceding the application due date for the Contract assignment, December 21, 2012. App., Vol. 7 at 1141-42. In both notices, the Internal Revenue Service (the "IRS") stated that "taxes . . . have been assessed against [Mr. Brown and his wife]" and that the United States "ha[s] made a demand for payment of this liability, but it remains unpaid." *Id.* In the first notice, prepared on February 18, 2011, the IRS assessed an unpaid balance of $15,117.95 from tax years 2008 and 2009. In the second notice, prepared on November 1, 2012, the IRS assessed an unpaid balance of $6,481.96 from tax year 2010. In both notices, the IRS also stated that "there is a lien in favor of the United States on all property and rights to property belonging to [Mr. Brown and his wife] for the amount of these taxes." *Id.*

14

The administrative record also contains Mr. Brown's sworn affidavit, in which he states that he had entered into an installment payment plan for his unpaid taxes with the IRS before ODRS selected him for the Contract assignment:

> At the time that I received the invitation to apply [for the Contract assignment] I was concluding negotiation of a payment plan with the U.S. Internal Revenue Service for certain personal income taxes that had not been properly filed on my behalf in prior years. I did enter into an agreed payment plan before the [ODRS] selection process had concluded. My monthly payments at an agreed amount began in February, 2013. To the extent that the IRS has filed any liens relating to taxes owed by me, those claimed taxes due are covered by the repayment plan and I have been assured that the IRS will not attempt any collection or treat me as a delinquent taxpayer while I am making the agreed payments according to the agreed payment plan.

*Id.* at 1126.

In his affidavit, Mr. Brown also stated that he had "discussed the above matter with Division Manager Mike Jones before applying for the selection process" and that Mr. Jones had "referred to particular U.S. Army regulations for contracting (DFARS) as the reason for including in the [Announcement] a section stating that the successful applicant would need to be clear of any tax delinquency." *Id.* at 1127. Mr. Brown stated that Mr. Jones had "advised [him] that DFARS itself contained a provision saying that taxes covered by an agreed repayment plan do not constitute a delinquency, and that [ODRS] would not consider [his] tax matter covered by a payment plan to be a delinquency." *Id.*

Mr. Jones's affidavit corroborated Mr. Brown's affidavit. In his affidavit, Mr. Jones stated: "Prior to submitting his application for the [Contract assignment], Robert

15

Brown advised me that he had learned that he had some unpaid federal taxes but that he had previously entered into a payment plan to satisfy his tax obligations and was making his payments as agreed." *Id.* at 1125. Mr. Jones also stated: "Applying both the DFARS standards and common sense, I determined that the payment plan being in place and not being breached meant that Mr. Brown did not have a tax 'delinquency' that would disqualify him from the selection process or from performing [the Contract] if selected, and I advised him of that position." *Id.*

Mr. Brown also testified at the arbitration hearing regarding unpaid taxes and his installment plan with the IRS. He elaborated on the plan's terms: "I was to pay back a set amount monthly, and then if there were ever any issues where I might [] be late, then they needed me to make sure I contacted them so that I would continue to be considered in good standing." App., Vol. 6 at 1031.

b. *Legal background*

The Federal Acquisition Regulations System ("FARS") is a set of regulations jointly promulgated by the Department of Defense, the General Services Administration, and the National Aeronautics and Space Administration to establish "uniform policies and procedures for acquisition by all executive agencies." 48 C.F.R. §§ 1.101, 1.103. Under the regulations, "[a]cquisition means the acquiring by contract with appropriated funds of supplies or services . . . by and for the use of the Federal Government through purchase or lease . . . ." *Id.* § 2.101.

16

Under FARS, a federal contractor may be debarred "based upon a preponderance of the evidence" for, among other things, "[d]elinquent Federal taxes in an amount that exceeds $3,500." *Id.* § 9.406-2(b)(1)(v).[6] FARS provides that:

> (A) Federal taxes are considered delinquent for purposes of this provision if both of the following criteria apply:
>
> > (1) The tax liability is finally determined. The liability is finally determined if *it has been assessed.* A liability is not finally determined if there is *a pending administrative or judicial challenge.* In the case of a judicial challenge to the liability, the liability is not finally determined until all judicial appeal rights have been exhausted.
> >
> > (2) The taxpayer is delinquent in making payment. A taxpayer is delinquent if the taxpayer has *failed to pay the tax liability when full payment was due and required.* A taxpayer is not delinquent in cases where enforced collection action is precluded.
>
> (B) Examples.
>
> . . .
>
> > (2) The IRS has filed a *notice of Federal tax lien* with respect to an assessed tax liability, and the taxpayer has been issued a *notice under I.R.C. § 6320 entitling the taxpayer to request a hearing* with the IRS Office of Appeals contesting the lien filing, and to further appeal to the Tax Court if the IRS determines to sustain the lien filing. *In the course of the hearing, the taxpayer is entitled to contest the underlying tax liability* because the taxpayer has had no prior opportunity to contest the liability. This is *not a delinquent tax because it is not a final*

---

[6] "Debarment means action taken . . . to exclude a contractor from Government contracting and Government-approved subcontracting for a reasonable, specified period; a contractor that is excluded is 'debarred.'" 48 C.F.R. § 2.101.

17

> *tax liability. Should the taxpayer seek tax court review, this will not be a final tax liability until the taxpayer has exercised all judicial appeal rights.*
>
> (3) The taxpayer has entered into *an installment agreement pursuant to I.R.C. § 6159.* The taxpayer is making timely payments and is in full compliance with the agreement terms. The taxpayer is *not delinquent because the taxpayer is not currently required to make full payment*.
>
> . . .

*Id.* § 9.406-2(b)(1)(v) (emphases added).

### c. *Analysis*

The Panel's finding that Mr. Brown was ineligible for the Contract assignment because he had a tax delinquency during the relevant time period was neither unsupported by substantial evidence, nor arbitrary or capricious.[7] Because this finding alone supports the Panel's conclusion that ODRS violated the RSA in selecting Mr. Brown, we need not address ODRS's challenges to the Panel's other bases for it conclusion.[8]

---

[7] We address both ODRS's substantial evidence and arbitrary or capricious challenges together because "[t]he arbitrary and capricious standard of review has been equated to the substantial evidence test." *AllCare Home Health, Inc. v. Shalala*, 278 F.3d 1087, 1089 (10th Cir. 2001). Our review under both standards is "narrow and highly deferential to the agency." *Jake's Fireworks Inc. v. Acosta*, 893 F.3d 1248, 1257 (10th Cir. 2018). Under these standards, we do not overturn an agency's factual findings if "a reasonable mind would consider the evidence adequate to support the conclusion reached." *Id.* (quotations omitted).

[8] Under the RSA, participating SLAs must "[t]ake effective action . . . to carry out full responsibility for the supervision and management of each vending facility in its program in accordance with its established rules and regulations, [DOE regulations], and the terms and conditions governing the permit [for each vending facility]." 34 C.F.R.

The administrative record adequately supports the Panel's finding that Mr. Brown had tax delinquencies in the three-year period before the Announcement's publication in December 2012 and was therefore ineligible for the Contract assignment. ODRS's Announcement expressly "deemed as [an] eligibility criteri[on]" an applicant's not having "had any delinquency on taxes *for the past 3 years*." App., Vol. 7 at 1139 (emphasis added). ODRS contends that the term "delinquency" as used in the Announcement should be given the same meaning it has under FARS debarment rules. But even accepting the FARS definition, the Panel did not err in concluding that Mr. Brown had a delinquency sometime in the three years before December 2012. In Mr. Brown's notices of federal tax lien, the IRS stated that it had "assessed" tax liabilities against Mr. Brown in tax years 2008, 2009, and 2010 and that Mr. Brown failed to comply when the IRS had previously "made a demand for payment." *Id.* at 1141, 1142.[9]

---

§ 395.3(a)(11)(ii). Accordingly, whether the tax eligibility requirement published in the Announcement was ODRS's rule or, as ODRS maintains, the Army's rule, ODRS's failure to enforce the requirement violated the RSA Program's terms.

[9] Under FARS, a tax liability is not a delinquency "if there is a pending administrative or judicial challenge." 48 C.F.R § 9.406-2(b)(1)(v)(A)(1). Accordingly, when the IRS files a federal tax lien and the taxpayer requests a hearing to "contest the underlying tax liability," the liability is not a delinquency. *Id.* § 9.406-2(b)(1)(v)(B)(2). And "[s]hould the taxpayer seek tax court review, this will not be a final tax liability until the taxpayer has exercised all judicial appeal rights." *Id.* ODRS relies on § 9.406-2(b)(1)(v)(B)(2) for the proposition that "the mere existence of a Notice of Federal Tax Lien is not evidence of a tax delinquency." Aplt. Br. at 40. And it contends that "[s]ince the burden of proof was on Altstatt and his only evidence on Brown's tax delinquency was the Notice of Federal Tax Liens, the Panel's conclusion that Brown was delinquent is not supported by substantial evidence and is arbitrary." *Id.* We disagree.

Taken together, §§ 9.406-2(b)(1)(v)(A)(1) and 9.406-2(b)(1)(v)(B)(2) mean that an assessed tax liability is not a delinquency only to the extent the taxpayer pursues an administrative or judicial challenge. Here, the administrative record does not show that

19

Mr. Brown's installment plan to repay his taxes does not compel a contrary conclusion. Under FARS, a taxpayer who "has entered into an installment agreement" and "is making timely payments and is in full compliance with the agreement terms" is not delinquent. 48 C.F.R § 9.406-2(b)(1)(v)(B)(3). According to his affidavit and testimony, Mr. Brown learned of his unpaid taxes sometime in 2012 and entered into an installment agreement with the IRS after ODRS published the Announcement in December 2012. *See* App., Vol. 6 at 1028, 1030-31; App., Vol. 7 at 1126. But he had a tax delinquency as early as February 18, 2011, when the IRS prepared the first notice of federal tax lien. App., Vol. 7 at 1141. His later installment plan cannot erase the fact that he had a tax delinquency during the three-year period preceding the Announcement's publication, contrary to its stated eligibility requirements. *See* App., Vol. 7 at 1139 (requiring applicants "[n]ot to have had *any* delinquency on taxes *for the past 3 years*" (emphasis added)). The record therefore contains substantial evidence that Mr. Brown was ineligible for the Contract assignment.

2. **The Relief Granted to Mr. Altstatt by the Panel**

Having rejected ODRS's challenges to the Panel's conclusion that Mr. Brown's selection violated the RSA, we now turn to ODRS's challenges to the types of relief the

---

Mr. Brown pursued such a challenge. Despite Mr. Brown's participation in the arbitration hearing as a witness, he never mentioned such a challenge. Instead, he testified that he did not learn of his tax liabilities until "the 2012 time frame," App., Vol. 6 at 1028, despite the IRS's filing notice of tax lien in February 2011 based on unpaid taxes from 2008 and 2009, App., Vol. 7 at 1141. He further testified that after he learned of the liabilities, rather than pursue a challenge, he began negotiating an installment plan with the IRS. App., Vol. 6 at 1030-31. In light of this record, we conclude that "a reasonable mind would consider the evidence adequate to support the [Panel's] conclusion." *Jake's Fireworks Inc.*, 893 F.3d at 1257 (quotations omitted).

Panel granted to Mr. Altstatt, whom the Panel determined should have received the Contract assignment instead. Providing additional legal background as needed, we address (a) the Panel's order to appoint Mr. Altstatt to the Contract, (b) the Panel's award of damages to Mr. Altstatt, and (c) the Panel's award of attorney fees to Mr. Altstatt.

a. *Order to appoint Mr. Alstatt to the Contract*

Under the APA, the reviewing court must "hold unlawful and set aside agency action," 5 U.S.C. § 706(2), that is "in excess of statutory jurisdiction, authority, or limitations," *id.* § 706(2)(C). ODRS contends the Panel exceeded its remedial authority under the RSA in ordering Mr. Altstatt's appointment to the Contract assignment. We disagree.

We begin with legal background on arbitration panels' power to grant prospective, or injunctive, relief to aggrieved blind vendors under the RSA. We then analyze whether the Panel's order to appoint Mr. Altstatt to the Contract assignment exceeded the scope of the Panel's authority and conclude that it did not.

i. Legal background

This court has not previously considered what forms of relief arbitration panels may grant aggrieved blind vendors under the RSA. Although this question has received limited judicial attention, the approaches to prospective relief in three out-of-circuit cases help inform our analysis: (1) *Delaware Department of Health & Social Services v. United States Department of Education*, 772 F.2d 1123 (3d Cir. 1985); (2) *Georgia Department of Human Resources v. Nash*, 915 F.2d 1482 (11th Cir. 1990); and (3) *Wisconsin Department of Workforce Development v. United States Department of*

21

*Education*, 667 F. Supp. 2d 1007 (W.D. Wis. 2009). We summarize the relevant discussion from each case.[10]

1) *Delaware Department of Health and Social Services—*
    interpreting the RSA in light of established arbitration principles

In *Delaware Department of Health and Social Services*, the Third Circuit considered whether the RSA authorizes arbitration panels to grant retrospective relief to aggrieved blind vendors. The district court had vacated an arbitration award of retrospective damages based on its "conclu[sion] that prospective arbitral relief against Delaware was clearly within the authority of the arbitrators . . . , but that . . . Congress could not have intended that the arbitrators have the authority to award retrospective relief." 772 F.2d at 1136.

The Third Circuit reversed, holding that "the district court erred in concluding that the arbitrators in a Randolph-Sheppard arbitration were not authorized to award compensatory damages." *Id.* at 1137. In reaching this outcome, and as relevant to our concern about prospective relief, the court considered the legal backdrop against which Congress had provided for arbitration of blind vendors' grievances under the RSA. The court considered that, "[w]hen Congress [amended the RSA] in 1974 [to] provide[] that states desiring to gain access to blind vendor locations in federal facilities must agree to submit to arbitration their disputes with blind vendors, the term arbitration had a well-recognized meaning." *Id.* at 1136.

_____

[10] We describe these decisions, not to opine on their holdings or results, but to detect approaches to remedial authority that may help us in deciding whether the injunctive relief awarded in this case was proper.

22

The court further considered that, in enacting the 1974 amendments, "Congress was surely aware that arbitrators proceeding under the authority of the Federal Arbitration Act or under the authority of the Uniform Arbitration Act, as a matter of course awarded retrospective compensatory relief in appropriate cases." *Id.* It also reviewed the legislative history materials and found "no . . . support[] [for] any reading of the term arbitration other than the conventional one." *Id.* at 1137.

Although Delaware also "contend[ed] that even prospective relief was improper," the Third Circuit did not address that question because the arbitration was limited to the claims of the blind vendor, who did not seek prospective relief. *Id.* at 1137 n.9; *see id.* at 1132. The court did not speak directly to whether an RSA arbitration panel may grant prospective relief, but it noted that the RSA "lends no support for the distinction drawn by the district court between prospective and compensatory relief." *Id.* at 1136-37.

2) *Georgia Department of Human Resources*—interpreting the RSA in view of the differences between §§ 107d-2(b)(1) and 107d-2(b)(2)

In *Georgia Department of Human Resources*, the Eleventh Circuit considered whether the RSA authorizes arbitration panels to award damages to a blind vendor "based on [the SLA's] failure to complain when a federal entity closed a vending stand located on property under its control." 915 F.2d at 1483. The district court had "upheld an award of compensatory damages to the blind vendor made by an arbitration panel convened under the Act" based on its "interpret[ation] [of] the statute to provide a blind vendor with [such] an action." *Id.*

23

The Eleventh Circuit reversed, holding that "the district court ha[d] misinterpreted the statute" and that such a "cause of action is inconsistent both with the Act's express language and its remedial structure." *Id.* at 1483, 1484-85. Again, as relevant to our concern, the court observed that the RSA provides separately for the arbitration of blind vendors' grievances against SLAs under § 107d-1(a) and for the arbitration of SLAs' grievances against federal entities under § 107d-1(b). *Id.* at 1487. It determined that the procedures for the two types of arbitration "are similar, but different, and these differences undermine the cause of action at issue." *Id.* at 1490.

Sections 107d-2(b)(1) and 107d-2(b)(2) of the RSA, which respectively establish procedures for vendor-versus-SLA and SLA-versus-federal entity arbitrations, mirror each other in structure—with one notable exception. The last sentence in § 107d-2(b)(2), which lacks a counterpart in § 107d-2(b)(1), provides:

> If the [arbitration panel appointed to hear an SLA's complaint] finds that the acts or practices of [the federal entity] are in violation of [the RSA or any implementing regulation], the head of any such [entity] shall cause such acts or practices to be terminated promptly and shall take such other action as may be necessary to carry out the decision of the panel.

20 U.S.C. § 107d-2(b)(2).

Relying on the inclusion of this sentence in § 107d-2(b)(2) and not in § 107d-2(b)(1), the Eleventh Circuit determined that "the [arbitration] panel's *remedial powers* vary under the two [types of arbitration]." *Ga. Dep't of Human Res.*, 915 F.2d at 1491 (emphasis added). It said that "[s]ection 107d–2 provides specific direction to the arbitration panel regarding remedies in [SLA-versus-federal entity] cases but provides no

24

instruction at all regarding remedies in [vendor-versus-SLA] cases." *Id.* The court

interpreted the sentence's *inclusion* in § 107d-2(b)(2) as "limit[ing] the panel's authority

to . . . determine that a violation is occurring and . . . identify[ing] the discrete acts that

are in violation." *Id.* at 1492. It thus determined that the RSA "does not authorize the

arbitration panel [hearing an SLA's complaint against a federal entity] to order the

federal entity to take any remedial action" and instead "expressly places the obligation of

ending the violation on the federal entity itself." *Id.* And the court interpreted the

sentence's *exclusion* in § 107d-2(b)(1) as imposing, "[i]n contrast to the[] express limits

on the arbitration panel's power in [SLA-versus-federal entity] cases, . . . no such limits

on the panel in [vendor-versus-SLA] cases." *Id.*

The court summarized the differences in the panel's remedial powers in the two

types of arbitrations:

> Whatever the exact limits of a [vendor-versus-SLA] panel's
> remedial powers, its powers are qualitatively different from
> those of a [SLA-versus-federal entity] panel. The Act gives
> [vendor-versus-SLA] panels *authority to impose remedies*
> *directly on the state licensing agency*. The [SLA-versus-
> federal entity] panel, however, under the Act's express terms,
> has no remedial powers whatsoever. It may determine that
> certain of the federal entity's acts violate the Act, but the Act
> leaves responsibility for remedying the violation to the
> federal entity itself.

*Id.* "Although [the court did not need to] decide the scope of an arbitration panel's

remedial powers [in a vendor-versus-SLC arbitration]" to resolve the case before it, it

"note[d] in passing that the Third Circuit has held that those panels' remedial powers are

equivalent to the powers of an arbitration panel under the Federal Arbitration Act or the

25

Uniform Arbitration Act." *Id.* (discussing *Del. Dep't of Health & Social Servs.*, 772 F.2d at 1136).

3) *Wisconsin Department of Workforce Development*—interpreting the RSA's arbitration provisions to effectuate congressional intent

In *Wisconsin Department of Workforce Development*, the federal district court reviewed an RSA arbitration decision granting an aggrieved blind vendor both retroactive money damages and prospective relief. The court vacated the damages award on the basis of sovereign immunity but upheld the injunctive relief. In doing so, it reasoned that "the arbitration panel must have the authority to grant some relief to blind licensees in order to give meaning to the arbitration provisions." 667 F. Supp. 2d at 1015; *see also New Hampshire v. Ramsey*, 366 F.3d 1, 18 (1st Cir. 2004) ("The effect of [an] argument [that neither retrospective damages nor prospective equitable relief is available to blind vendors] would be to render [the RSA's grievance] procedures meaningless.").

ii. Analysis

The Panel acted within its remedial power under the RSA in ordering ODRS to appoint Mr. Altstatt as the Contract manager.[11] Confronted with silence as to the remedies available to aggrieved blind vendors in the RSA's text, and implementing

---

[11] In its supplemental brief, DOE said "the RSA authorizes arbitration panels to issue all forms of prospective equitable relief." Aplee. DOE Suppl. Br. at 6. We need not decide whether DOE's interpretation of the statute is entitled to deference because, as we explain below, we agree with DOE even under de novo review. In any event, DOE has not claimed any entitlement to deference. *See Hydro Res., Inc. v. U.S. EPA*, 608 F.3d 1131, 1146 (10th Cir. 2010) (en banc) ("[W]hen the agency doesn't ask for deference to its statutory interpretation, we need not resolve the issues regarding deference which would be lurking in other circumstances." (alterations and quotations omitted)).

regulations, we find instructive the interpretive approaches other courts have applied to the statute.[12] And ODRS has not offered—nor have we identified—a competing approach to interpreting the RSA's remedial provisions.

Each of the three approaches to interpreting the RSA in the cases discussed above lends support to the conclusion that the RSA broadly authorizes arbitration panels to fashion prospective remedies for aggrieved blind vendors.[13] The first approach—interpreting the RSA in light of established commercial arbitration principles at the time Congress enacted the arbitration scheme in 1974—provides support because, under the American Arbitration Association rules, an arbitrator could "grant any remedy or relief which he deems just and equitable." Martin Domke, *The Law and Practice of*

---

[12] The sparse legislative history on this issue points to the result reached here. The purpose of the RSA's vendor-versus-SLA arbitration procedures is to provide aggrieved vendors with an effective means to resolve their grievances against SLAs. *See, e.g.*, S. Rep. No. 98-937, at 20 (1974) ("It is the expectation of the Committee [on Labor and Public Welfare] that the arbitration and review procedures . . . will provide the means by which aggrieved vendors . . . may obtain a *final and satisfactory* resolution of disputes." (emphasis added)). One of the "conditions [that] prompted the inclusion of these [arbitration procedures] . . . [was that] blind vendors ha[d] considered previously available legal procedures to be inadequate." 121 Cong. Rec. 16,227 (1975) (speech on RSA Amendments of 1974 inserted into the record by Rep. John Brademas).

[13] We see no reason why such authority should not extend to the specific form of relief at issue here—the order to appoint Mr. Altstatt to the Contract assignment. ODRS contends that, under the RSA, "the Arbitration Panel had no authority to preempt [its] rules concerning how to select managers for a particular facility" and that "[i]ts only authority was to review and judge the selection process that had been conducted." Aplt. Br. at 34. We agree that the RSA delegates authority to SLAs to promulgate rules governing their operation of the RSA Program, *see* 20 U.S.C. § 107b(5), including the selection of blind vendors for particular vending assignments. But the RSA nowhere prohibits an arbitration panel from remedying violations of such rules by ordering the offending SLA to appoint the aggrieved blind vendor to the disputed assignment should it find that, but for the violation, the vendor would have received the assignment.

27

*Commercial Arbitration*, § 30:01 (1968) (quotations omitted). The second approach—interpreting the RSA by comparing its provisions pertaining to the two types of arbitration proceedings—offers support because, although Congress included language limiting the arbitration panel's remedial power in SLA-versus-federal entity arbitrations, 20 U.S.C. § 107d-2(b)(2), no such language appears for vendor-versus-SLA arbitrations, *see id.* § 107d-2(a). The third approach—interpreting the RSA to effectuate its arbitration scheme—supplies support because, if arbitration panels lacked authority to fashion injunctive relief, blind vendors would lack a complete remedy for their grievances arising from SLAs' operation of the RSA Program.[14]

Drawing on these various approaches to interpreting the RSA's remedial provisions, we conclude that the Panel acted within its remedial power in ordering ODRS to appoint Mr. Altstatt as the Contract manager.[15]

---

[14] Blind vendors ordinarily may not obtain compensatory relief for their grievances because, as we explain below, SLAs enjoy sovereign immunity from damages awarded to a blind vendor by an RSA arbitration panel.

[15] ODRS primarily challenges the order to appoint Mr. Altstatt as exceeding the scope of the Panel's statutory authority. But ODRS also appears to bring a separate, albeit cursory, challenge to the order as arbitrary and capricious.

As discussed above, the Panel properly found that Mr. Brown was ineligible for the Contract assignment because of his tax delinquency. Mr. Altstatt received the next highest total score of all the candidates and thus presumably should have received the Contract assignment. App., Vol. 7 at 1231 (Mr. Altstatt received a total score of 300.75, whereas the remaining two candidates received 239.25 and 266.75). ODRS appears to contend, however, that the Panel's consideration of the candidates' total scores—comprised of the scores from the original selection process supplemented with the scores for the previously omitted factor, as later calculated by ODRS during the re-selection process—was arbitrary and capricious given the Panel's determination that the original selection process was flawed. Aplt. Br. at 33. We disagree.

28

b. *Award of damages to Mr. Altstatt*

Under the APA, the reviewing court must "hold unlawful and set aside agency action," 5 U.S.C. § 706(2), that is "contrary to constitutional right, power, privilege, or immunity," *id.* § 706(2)(B). ODRS contends the Panel's damages award violates its sovereign immunity. We agree and hold the award should be vacated.

We begin with legal background on sovereign immunity's application to agency adjudications and standards governing waiver of sovereign immunity as to money damages. We then proceed to analyze whether sovereign immunity bars the Panel's damages award. Guided by the Supreme Court's decisions in *Federal Maritime Commission v. South Carolina State Ports Authority*, 535 U.S. 743 (2002), and *Sossamon v. Texas*, 563 U.S. 277 (2011), we conclude that it does.

i. Legal background

"Sovereign immunity is the privilege of the sovereign not to be sued without its consent." *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 253 (2011). A state's sovereign immunity extends to its agencies and departments. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) ("It is clear, of course, that in the

---

Apart from Mr. Brown's ineligibility, the Panel identified two other flaws in the original selection process: (1) the omission of a required scoring factor, and (2) Mr. Pride's friendship with Mr. Brown. But neither flaw rendered the Panel's consideration of the original scores arbitrary or capricious because Mr. Altstatt had the next highest score with or without the scores for the previously omitted factor and with or without the scores given by Mr. Pride. *See* App., Vol. 7 at 1231 (subtracting the previously omitted "Annual Evaluation Score[s]" from the total scores, Mr. Altstatt received 290.75, whereas the remaining two candidates received 226.25 and 251.75; subtracting Mr. Pride's scores from the total scores, Mr. Altstatt received 246.75, whereas the remaining two candidates received 183.25 and 206.75).

29

absence of consent a suit in which the State *or one of its agencies or departments* is named as the defendant is proscribed by the Eleventh Amendment." (emphasis added)).

The Eleventh Amendment, which constitutionalizes the doctrine of sovereign immunity, provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The Supreme Court "has repeatedly held that the sovereign immunity enjoyed by the States extends beyond the literal text of the Eleventh Amendment." *Fed. Mar. Comm'n*, 535 U.S. at 754.

We discuss (1) sovereign immunity's application to agency adjudications and (2) the standards governing waiver of sovereign immunity as to money damages.

1) Sovereign immunity's application to agency adjudications:
   *Federal Maritime Commission*

In *Federal Maritime Commission*, the Supreme Court addressed for the first time whether a state's sovereign immunity extends to federal agency adjudications of private complaints against state agencies. In this instance, the Federal Maritime Commission (the "FMC") adjudicated a complaint filed by a private company against the South Carolina State Ports Authority, which had denied the company permission to berth a cruise ship at the state's port facilities. *Id.* at 747. The Court "h[eld] that state sovereign

immunity bars the FMC from adjudicating complaints filed by a private party against a nonconsenting State." *Id.* at 760.[16]

In its analysis, the Court examined "whether [FMC adjudications] are the type of proceedings from which the Framers would have thought the States possessed immunity when they agreed to enter the Union." *Id.* at 756. To answer this question, the Court first considered general similarities between an agency adjudication before an Administrative Law Judge ("ALJ") and civil litigation before an Article III judge. It noted the "similarities between the role of an ALJ and that of a trial judge"[17] and "the numerous

---

[16] The Court clarified that "[s]overeign immunity does not merely constitute a defense to monetary liability or even to all types of liability" but rather "provides an immunity from suit." *Fed. Mar. Comm'n*, 535 U.S. at 766. It thus suggested that sovereign immunity bars the FMC from adjudicating private complaints against state entities "regardless of whether [the adjudication] is for monetary damages or some other type of relief" and, indeed, even "if Congress had . . . precluded [the FMC] from awarding [private parties] any relief." *Id.* at 765, 766.

[17] The Court said:

> "There can be little doubt that the role of the modern federal hearing examiner or administrative law judge . . . is 'functionally comparable' to that of a judge. His powers are often, if not generally, comparable to those of a trial judge: He may issue subpoenas, rule on proffers of evidence, regulate the course of the hearing, and make or recommend decisions. More importantly, the process of agency adjudication is currently structured so as to assure that the hearing examiner exercises his independent judgment on the evidence before him, free from pressures by the parties or other officials within the agency."

*Fed. Mar. Comm'n*, 535 U.S. at 756 (quoting *Butz v. Economou*, 438 U.S. 478, 513 (1978)).

31

common features shared by administrative adjudications and judicial proceedings."[18]  *Id.*
at 756-57.  The Court then considered specific similarities between FMC and Article III proceedings, including:  (1) "the FMC's Rules governing pleadings are quite similar to those found in the Federal Rules of Civil Procedure," *id.* at 757; (2) "discovery in FMC adjudications largely mirrors discovery in federal civil litigation," *id.* at 758-59; (3) "similar to that of an Article III judge," the ALJ's role in an FMC adjudication includes arranging, giving notice, and managing the conduct of a hearing, granting appropriate relief, and issuing a ruling that ordinarily becomes the agency's final decision, *id.* at 759; and (4) the FMC's own rules provide for application of the Federal Rules of Civil Procedure and the Federal Rules of Evidence in many situations, *id.* at 759 & n.10.

In light of the foregoing, the Court concluded that "the similarities between FMC proceedings and civil litigation are overwhelming."  *Id.* at 759.  It also clarified that

---

[18] The Court said:

> "[F]ederal administrative law requires that agency adjudication contain many of the same safeguards as are available in the judicial process.  The proceedings are adversary in nature.  They are conducted before a trier of fact insulated from political influence.  A party is entitled to present his case by oral or documentary evidence, and the transcript of testimony and exhibits together with the pleadings constitute the exclusive record for decision.  The parties are entitled to know the findings and conclusions on all of the issues of fact, law, or discretion presented on the record."

*Fed. Mar. Comm'n*, 535 U.S. at 756-57 (quoting *Butz*, 438 U.S. at 513 (alteration in *Fed. Mar. Comm'n*)).

"[t]he preeminent purpose of state sovereign immunity is to accord States the dignity that is consistent with their status as sovereign entities." *Id.* at 760. "Given both this interest in protecting States' dignity and the strong similarities between FMC proceedings and civil litigation," the Court held that state sovereign immunity extends to formal FMC adjudications before an ALJ. *Id.* It said that "[t]he affront to a State's dignity does not lessen when an adjudication takes place in an administrative tribunal as opposed to an Article III court." *Id.* It further suggested that "allowing a private party to haul a State in front of such an administrative tribunal constitutes a greater insult . . . than requiring a State to appear in an Article III court presided over by a judge with life tenure nominated by the President . . . and confirmed by the . . . Senate." *Id.* at 760 n.11.

2) Waiver of sovereign immunity as to money damages: *Sossamon*

"A State . . . may choose to waive its [sovereign] immunity . . . at its pleasure." *Sossamon*, 563 U.S. at 284. The "test for determining whether a State has waived its immunity . . . is a stringent one." *Id.* (quotations omitted). "A State's consent to suit must be unequivocally expressed." *Id.* (quotations omitted). "A state can express such unequivocal intent by statute, constitutional provision, or through its actions, specifically, its *participation in a particular federal program*." *Arbogast v. Kan. Dep't of Labor*, 789 F.3d 1174, 1182 (10th Cir. 2015) (emphasis added) (quotations omitted). When the statute enacting a federal program unequivocally expresses Congress's intent to condition states' participation on their consenting to suit, their participation then results in a waiver of sovereign immunity. *See id.* at 1182-83.

33

In *Sossamon*, the Supreme Court addressed the standards governing states' waiver of sovereign immunity as to money damages. *Sossamon* presented the question of "whether the States, by accepting federal funds, consent to waive their sovereign immunity to suits for money damages under the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA)." *Id.* at 280. To answer this question, the Court examined RLUIPA, which "includes an express private cause of action . . . : 'A person may assert a violation . . . in a judicial proceeding and obtain *appropriate relief* against a government.'" *Id.* at 282 (emphasis added) (quoting 42 U.S.C. § 2000cc-2(a)).

Based on this language, the Court held that states do not waive sovereign immunity by accepting federal funds under RLUIPA. *Id.* at 280, 285-88. It clarified that the "waiver of sovereign immunity to other types of relief does not waive immunity to damages." *Id.* at 285. With this principle in mind, it concluded that "RLUIPA's authorization of 'appropriate relief against a government,' § 2000cc–2(a), is not the unequivocal expression of state consent that our precedents require [to effectuate a waiver of sovereign immunity]." *Id.* It reasoned that the term "'[a]ppropriate relief' is open-ended and ambiguous about what types of relief it includes" and that "the word 'appropriate' is inherently context-dependent." *Id.* at 286. The Court said that "[t]he context here—where the defendant is a sovereign—suggests, if anything, that monetary damages are not suitable or proper." *Id.* (quotations omitted). And it further clarified that, "where a statute is susceptible of multiple plausible interpretations, including one preserving immunity, we will not consider a State to have waived its sovereign immunity." *Id.* at 287.

34

ii. Analysis

ODRS's assertion of sovereign immunity as to the Panel's damages award presents two questions of first impression before this court: (i) whether sovereign immunity extends to RSA arbitrations of vendor complaints, and, if so, (ii) whether ODRS's participation in the RSA Program effectuates a waiver of sovereign immunity as to damages. Guided by *Federal Maritime Commission* and *Sossamon*, we conclude that sovereign immunity bars the Panel's damages award because (i) sovereign immunity extends to RSA arbitration proceedings, and (ii) ODRS's participation in the RSA Program does waive not its sovereign immunity from damages awards.[19]

1) Sovereign immunity extends to RSA arbitration proceedings

We first address whether sovereign immunity extends to arbitrations of vendor complaints against SLAs under the RSA. Our analysis proceeds in two parts. First, we examine the Supreme Court's rationale for extending sovereign immunity to FMC adjudications and conclude that it supports doing so in the RSA context as well. Second, we discuss some notable differences between RSA arbitrations and FMC adjudications and conclude that they do not materially distinguish the two types of proceedings for purposes of state sovereign immunity.

---

[19] ODRS has not asserted sovereign immunity from RSA arbitration proceedings generally or from any other type of relief, apart from money damages and attorney fees. As we explain below, the RSA does not authorize attorney fees in any event. We therefore do not decide whether ODRS's participation in the RSA Program, although not a waiver of sovereign immunity as to damages, nevertheless waives sovereign immunity from RSA arbitration proceedings generally or from other forms of relief.

a) *Federal Maritime Commission*'s rationale extends to the RSA context

The Supreme Court based its holding in *Federal Maritime Commission*—that sovereign immunity applies in the context of FMC adjudications—on the need "to accord States the dignity that is consistent with their status as sovereign entities" and on "the strong similarities between FMC proceedings and civil litigation." 535 U.S. at 760. Both bases support extending *Federal Maritime Commission*'s holding to the RSA context.

i) Need to accord dignity

As with FMC adjudications, RSA arbitrations of private complaints affront the states' dignity as sovereign entities. In *Federal Maritime Commission*, the Supreme Court explained: "[I]f the Framers thought it an impermissible affront to a State's dignity to be required to answer the complaints of private parties in federal courts, we cannot imagine that they would have found it acceptable to compel a State to do exactly the same thing before the administrative tribunal of an agency, such as the FMC." *Id.* The RSA's mandatory arbitration scheme likewise affronts states' dignity because it effectively "compel[s] a State to [answer private complaints] before the administrative tribunal of an agency." *Id.* Under the RSA, SLAs such as ODRS must submit to final and binding arbitration of blind vendors' grievances against them by panels convened by DOE. *See* 20 U.S.C. § 107d-1(a).

Furthermore, the Supreme Court suggested in *Federal Maritime Commission* that "[o]ne, in fact, could argue that allowing a private party to haul a State in front of . . . an administrative tribunal constitutes a greater insult to a State's dignity than requiring a State to appear in an Article III court presided over by a judge with life tenure nominated

36

by the President . . . and confirmed by the . . . Senate." 535 U.S. at 760 n.11. Such an

argument appears to have equal, if not greater, force in an RSA arbitration before an

ad hoc panel.[20]

ii) Similarities to Article III proceedings

As with FMC adjudications, RSA arbitrations share in common with Article III

judicial proceedings many of the features noted by the Supreme Court as supporting the

---

[20] Four justices and several commentators have criticized the Court's dignity rationale in *Federal Maritime Commission* as confusing or unworkable in application. *See Fed. Mar. Comm'n*, 535 U.S. at 772 (Stevens, J., dissenting) ("The reasons why the majority in [*Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419 (1793)] concluded that the 'dignity' interests underlying the sovereign immunity of English Monarchs had not been inherited by the original 13 States remain valid today. By extending the untethered 'dignity' rationale to the context of routine federal administrative proceedings, today's decision is . . . anachronistic." (citation omitted)); *id.* at 786 (Breyer, J., dissenting) ("The Court's decision threatens to deny the Executive and Legislative Branches of Government the structural flexibility that the Constitution permits and which modern government demands. The Court derives from the abstract notion of state 'dignity' a structural principle that limits the powers of both Congress and the President."); *see also, e.g.*, Scott Dodson, *Dignity: The New Frontier of State Sovereignty*, 56 Okla. L. Rev. 777, 778 (2003) ("[T]he dignity rationale itself lacks substantial justification and is untethered to any limiting principles save those locked inside the minds of five Justices."); Scott Fruehwald, *The Supreme Court's Confusing State Sovereign Immunity Jurisprudence*, 56 Drake L. Rev. 253, 301 (2008) ("How can the Court assert that a state's dignity is impacted by having to appear at an administrative hearing, as was true in *Federal Maritime Commission*, but not in front of a federal bankruptcy court? This inconsistency suggests that . . . dignity is not a proper consideration when evaluating sovereignty."); Gordon G. Young, Federal Maritime Commission v. South Carolina State Ports Authority*: Small Iceberg or Just the Tip?*, 47 St. Louis U. L.J. 971, 997 (2003) ("The *Maritime* majority opinion, perhaps more than any other in the immunity series, unashamedly identified the difficult to quantify notion of state 'dignity' as the principal value [of sovereign immunity].").

Notwithstanding such criticisms, we are bound to apply Supreme Court precedent. Because we discern no reason why RSA arbitrations would pose a lesser affront to a state's dignity than FMC adjudications, we conclude that the dignity rationale favors extending sovereign immunity to the former.

application of sovereign immunity. For example, RSA arbitrations are "adversary in nature." *Fed. Mar. Comm'n*, 535 U.S. at 757 (quoting *Butz v. Economou*, 438 U.S. at 514).[21] Likewise, parties to RSA arbitrations are "entitled to present [their] case[s] by oral or documentary evidence, and the transcript of testimony and exhibits together with the pleadings constitute the exclusive record for decision." *Fed. Mar. Comm'n*, 535 U.S. at 757 (quoting *Butz*, 438 U.S. at 513); *see* RSA Arbitration Policies at 4-5 ("The parties may . . . [p]resent relevant and material evidence on the issues in the arbitration."); *id.* at 6 ("The transcripts of testimony, including transcripts of depositions introduced as evidence, and any pleadings, motions, stipulations, exhibits, briefs, and rulings by the panel . . . shall constitute the exclusive record for decision."). And parties are "entitled to know the findings and conclusions on all of the issues of fact, law, or discretion presented on the record." *Fed. Mar. Comm'n*, 535 U.S. at 757 (quoting *Butz*, 438 U.S. at 513); *see* RSA Arbitration Policies at 6 ("The decision of the arbitration panel shall be in writing and contain a statement of the rationale, including findings of fact and conclusions of law, upon which it is based.").

     b) Differences do not materially distinguish RSA and FMC proceedings for purposes of sovereign immunity

Our analysis thus far points to the extension of *Federal Maritime Commission*'s holding to the RSA context. On the other hand, four notable characteristics distinguish

---

[21] The parties to an arbitration of a blind vendors' complaint are "the complainant blind licensee and the State licensing agency." RSA Arbitration Policies at 1. The arbitration is party-driven, with the parties presenting evidence and making arguments in support of their respective positions. *See id.* at 4-5.

RSA arbitrations from the FMC adjudications at issue in *Federal Maritime Commission*. We first identify these differences and then explain why they do not compel us to reject sovereign immunity in the RSA context.

i) Differences between RSA and FMC proceedings

(1) **<u>Decisionmaker</u>**—In contrast to FMC proceedings before ALJs, RSA proceedings are not necessarily decided by a "federal officer," *Fed. Mar. Comm'n*, 535 U.S. at 761. Under the RSA, DOE convenes ad hoc arbitration panels to hear and render decision on vendor grievances against SLAs. 20 U.S.C. §§ 107d-1, 107d-2(a). These panels are composed of three members:

> (A)  one individual designated by the State licensing agency;
>
> (B)  one individual designated by the blind licensee; and
>
> (C)  one individual, not employed by the State licensing agency or, where appropriate, its parent agency, who shall serve as chairman, jointly designated by the members appointed under subparagraphs (A) and (B).
>
> If any party fails to designate a member under subparagraph (1)(A), (B), or (C), the Secretary shall designate such member on behalf of such party.

*Id.* § 107d-2(b)(1).

Additionally, unlike ALJs (and also Article III judges), who "may issue subpoenas," *Fed. Mar. Comm'n*, 535 U.S. at 756 (quoting *Butz*, 438 U.S. at 513), RSA arbitration panels "do[] not have the authority to compel by subpoena the production of witnesses, papers, or other evidence." RSA Arbitration Policies at 4.

39

(2) **Agency's Role in Screening Complaints**—Unlike the FMC, which "does not even have the discretion to refuse to adjudicate complaints brought by private parties," *Fed. Mar. Comm'n*, 535 U.S. at 764, DOE reviews vendor complaints and, under some circumstances, dismisses them without arbitration:

> After the complaint has been docketed it will be reviewed by [DOE's] Division for the Blind and Visually Impaired. . . .
>
> (a) If the complaint alleges sufficient relevant and material facts which, if proved, would entitle the blind licensee to any of the relief sought and if any of the relief sought is within the authority of the arbitration panel to grant, . . . an ad hoc arbitration panel will be convened.
>
> (b) If the complaint fails to allege sufficient relevant and material facts which, if proved, would entitle the blind licensee to any of the relief sought; or, if none of the relief sought is within the authority of the arbitration panel to grant, the blind licensee will be so notified . . . and given an opportunity to amend the complaint . . . .
>
> (d) If . . . the amended complaint fails to allege sufficient relevant and material facts or . . . none of the relief sought is within the power of the arbitration panel to grant, . . . the complaint is dismissed.
>
> (e) If the complaint does not allege facts which indicate dissatisfaction with all or part of the decision rendered [by the SLA] as a result of a full evidentiary hearing, or action taken as a result of a full evidentiary hearing, . . . the complaint is dismissed.
>
> (f) If . . . the complaint is specious or . . . has been filed solely for the purpose of harassment, . . . the complaint is dismissed.

RSA Arbitration Policies at 2-3.

(3) **<u>Default Judgments</u>**—Whereas "default judgment may be entered on behalf of the plaintiff" in an FMC adjudication, should the defendant fail to respond to the complaint, *Fed. Mar. Comm'n*, 535 U.S. at 757, "[t]he failure to file an answer [to an RSA vendor complaint] will not . . . result in the default of the State licensing agency." RSA Arbitration Policies at 3. The applicable policies and procedures instead appear to contemplate that the arbitration would proceed even in the absence of the SLA's answer. *See id.* ("The issues for arbitration and the positions of the parties thereon may be identified at the pre-arbitration conference.").

(4) **<u>Formality of Procedures and Rules</u>**—The procedures and rules governing the conduct of RSA arbitrations are generally more informal and ad hoc than those governing FMC adjudications. For example, whereas "discovery in FMC adjudications largely mirrors discovery in federal civil litigation," *Fed. Mar. Comm'n*, 535 U.S. at 758, discovery in RSA arbitrations proceeds only to the extent that, "[i]f the panel chairperson determines that the interest of justice would be served, he may authorize the taking of depositions," RSA Arbitration Policies at 5. And whereas the Federal Rules of Evidence generally apply in FMC adjudications, *Fed. Mar. Comm'n*, 535 U.S. at 759 n.10, "[t]echnical rules of evidence shall not apply to [RSA] arbitration[s], but rules or principles designed to assure production of the most credible evidence available and to subject testimony to test by cross-examination shall be applied by the panel chairperson," RSA Arbitration Policies at 5.

ii) Why differences do not compel rejection of
sovereign immunity in the RSA context

Despite the foregoing differences, and guided by *Federal Maritime Commission*, we nevertheless conclude that RSA arbitrations are materially indistinguishable from FMC adjudications for purposes of state sovereign immunity. We address each in turn:

(1) **<u>Decisionmaker</u>**—The differences between RSA arbitration panels and FMC ALJs do not compel the conclusion that sovereign immunity extends only to the latter.

Although ad hoc panels—rather than ALJs—arbitrate vendor complaints under the RSA, the role of the RSA panel—like that of the ALJ—is "'functionally comparable' to that of a judge." *Fed. Mar. Comm'n*, 535 U.S. at 756 (quoting *Butz*, 438 U.S. at 513). ALJs enjoy certain protections from political influence and thereby serve as "impartial officer[s] designated to hear a case." *Id.* at 758 (citation omitted). RSA panels are likewise "structured so as to assure that the[y] exercise[] [their] independent judgment on the evidence." *Id.* at 756 (quoting *Butz*, 438 U.S. at 513). Specifically, their composition helps to assure impartiality—each party designates one panel member, and the third member, who presides over the arbitration, is jointly selected by the two party-designated members. *See* 20 U.S.C. § 107d-2(b)(1).

Additionally, RSA arbitration panels, like ALJs, have powers that "are often, if not generally, comparable to those of a trial judge." *Fed. Mar. Comm'n*, 535 U.S. at 756 (quoting *Butz*, 438 U.S. at 513). For example, RSA panels "ha[ve] the authority to arrange and give notice of hearing[s]." *Id.* at 758 (quotations omitted); *see* RSA Arbitration Policies at 3. They also regulate the conduct of the hearing and may "prescribe the order in which evidence shall be presented; . . . administer oaths and affirmations; examine witnesses; . . . rule upon offers of proof[,] . . . [and] fix[] the time

42

and manner of filing briefs." *Fed. Mar. Comm'n*, 535 U.S. at 758-59 (quotations omitted); *see* RSA Arbitration Policies at 4. And they "issue[] a decision that . . . subsequently becomes the final decision of the [agency]." *Fed. Mar. Comm'n*, 535 U.S. at 759; *see* RSA Arbitration Policies at 4. Although RSA panels "do[] not have the authority to compel by subpoena the production of witnesses, papers, or other evidence," RSA Arbitration Policies at 4, their powers on balance are "comparable to those of a trial judge," *Fed. Mar. Comm'n*, 535 U.S. at 756 (quoting *Butz*, 438 U.S. at 513).

(2) **Agency's Role in Screening Complaints**—DOE's authority to deny arbitration under certain circumstances does not defeat *Federal Maritime Commission*'s logical extension to the RSA context. DOE's authority to dismiss complaints is limited and does not "convert an [RSA arbitration] initiated and pursued by a private party into one initiated by the Federal Government." *Id.* at 764.[22] DOE may dismiss a complaint only upon effectively determining that it lacks any merit, *see* RSA Arbitration Policies at 2-3, much as a federal district judge "may dismiss [a complaint] sua sponte when it is patently obvious that the plaintiff could not prevail on the facts alleged, and allowing him an opportunity to amend his complaint would be futile," *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (quotations omitted); *see also* Charles Alan Wright, Arthur R. Miller et al., 5B *Federal Practice & Procedure* § 1357 (3d ed., April 2018 update)

---

[22] The Supreme Court has said that, "[i]n ratifying the Constitution, the States consented to suits brought . . . by the Federal Government. . . . Suits brought by the United States itself require the exercise of political responsibility for each suit prosecuted against a State, a control which is absent from a broad delegation to private persons to sue nonconsenting States." *Alden v. Maine*, 527 U.S. 706, 755-56 (1999).

("[T]he district judge on his or her own initiative may note the inadequacy of the complaint and dismiss it . . . as long as the procedure employed is fair to the parties.").

In other words, "the only duty assumed by [DOE], and hence the United States, in conjunction with a private complaint is to assess its merits in an impartial manner." *Fed. Mar. Comm'n*, 535 U.S. at 764. DOE lacks broad discretion to dismiss vendor complaints based on policy or other considerations unrelated to the merits. "As a result, the United States plainly does not exercise political responsibility for such complaints, but instead has impermissibly effected a broad delegation to private persons to sue nonconsenting States." *Id.* at 764 (alterations and quotations omitted).

(3) **Default Judgments**—DOE's inability to enter default judgments against SLAs is not at odds with our conclusion that sovereign immunity applies in the RSA context. Notwithstanding this feature of RSA arbitrations, "[an SLA] seeking to contest the merits of a complaint filed against it by a [blind vendor] must defend itself in front of the [arbitration panel] or substantially compromise its ability to defend itself at all." *Fed. Mar. Comm'n*, 535 U.S. at 762. An SLA may decline to file an answer to a blind vendor's complaint without incurring a default judgment against it, and yet it would still be hard-pressed to decline to participate in the arbitration proceeding in its entirety.[23]

Once an arbitration panel has rendered a decision, that decision is "final and binding on the parties." 20 U.S.C. § 107d-1(a). Although the SLA may seek judicial

---

[23] As noted above, the applicable policies and procedures appear to contemplate that an RSA arbitration of a blind vendor's complaint would proceed whether or not the SLA files an answer. *See* RSA Arbitration Policies at 3.

review, failure to participate in the arbitration proceeding would hamper its ability to challenge the panel's decision in federal court. The Supreme Court has previously established "a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice." *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952). In *Federal Maritime Commission*, the Court, citing this general rule, concluded that FMC adjudications are coercive in part because, "if a party fails to appear before the FMC, it may not then argue the merits of its position in an appeal of the [FMC's] determination." 535 U.S. at 762.

To the extent the general rule against courts' considering objections not made in the agency proceeding also applies here, failure to appear before the RSA arbitration panel would severely constrain an SLA's ability to appeal the merits. And even if the court were to consider the merits, the APA's judicial review standards would, as a practical matter, limit the scope of the appeal. *See Council Tree Inv'rs, Inc. v. FCC*, 739 F.3d 544, 555 (10th Cir. 2014) ("Although we review matters of law de novo, . . . the standard of review is [otherwise] very deferential to the agency.[] A presumption of validity attaches to the agency action and the burden of proof rests with the parties who challenge such action." (citations and quotations omitted)).[24]

---

[24] One other related distinction between FMC and RSA proceedings bears noting here. Unlike the FMC, which "may impose monetary penalties for each day of noncompliance" with an FMC order, *Fed. Mar. Comm'n*, 535 U.S. at 763, the RSA does not authorize DOE to impose sanctions on SLAs that refuse to comply with an arbitration panel's order. We nevertheless conclude that the RSA's mandatory arbitration scheme as a whole, like the FMC adjudication scheme, "makes it quite clear that, absent sovereign

(4) **Formality of Procedures and Rules**—The relative informality of RSA arbitrations' procedures and rules does not undermine *Federal Maritime Commission*'s application to the RSA context.  In that case, the Supreme Court said that its "review of the FMC's Rules of Practice and Procedure *confirms* that FMC administrative proceedings bear a remarkably strong resemblance to civil litigation in federal courts." *Fed. Mar. Comm'n*, 535 U.S. at 757 (emphasis added).  Although the rules and procedures governing RSA arbitrations are less formal than in FMC adjudications, in light of their general similarities and the other considerations discussed above, we conclude that RSA and Article III proceedings are sufficiently similar to warrant extending sovereign immunity to the former context.

* * * *

In sum, as in *Federal Maritime Commission*, the "interest in protecting States' dignity and the strong similarities between [RSA] proceedings and civil litigation" compel us to conclude that state sovereign immunity bars RSA arbitration panels from adjudicating complaints filed by a private party against a nonconsenting State.  535 U.S. at 760.  *But see Premo v. Martin*, 119 F.3d 764, 769 (9th Cir. 1997) (pre-*Federal Maritime Commission* decision holding "that the Eleventh Amendment does not apply to Randolph–Sheppard arbitration proceedings and thus does not limit the authority of arbitration panels convened under the Act to award compensatory relief"); *Tenn. Dep't of Human Servs. v. U.S. Dep't of Educ.*, 979 F.2d 1162 (6th Cir. 1992) (same).  The

immunity, States would effectively be required to defend themselves against private parties in front of the [arbitration panel]." *Id.*

46

differences between RSA arbitrations and the FMC adjudications at issue in *Federal Maritime Commission* do not persuade us to the contrary.

>2)  ODRS has not waived sovereign immunity as to money damages

Having determined that state sovereign immunity applies to RSA arbitrations, we now address whether ODRS has nevertheless consented to suit for money damages by participating in the RSA Program.

Guided by *Sossamon*, we conclude that the RSA is insufficiently explicit to render state participation in the RSA Program a waiver of sovereign immunity from an RSA arbitration panel award for damages.[25]  Like RLUIPA, which authorizes private parties to sue states for "appropriate relief," the RSA does not expressly enumerate the types of remedies available to private parties aggrieved by a state.  *Compare* 42 U.S.C. § 2000cc-2(a) *with* 20 U.S.C. §§ 107d-1(a), 107d-2(a)-(b)(1).  In *Sossamon*, the Supreme Court held that states, by accepting federal funding under RLUIPA, do not waive sovereign immunity as to damages because the term "appropriate relief" is too "open-ended and ambiguous about what types of relief it includes."  563 U.S. at 286.  Here, the RSA does not even use the words "appropriate relief."  It is silent as to what remedies aggrieved vendors may obtain against SLAs and is therefore just as "open-ended and ambiguous" as RLUIPA, if not more.

---

[25] This case presents no opportunity to address the extent to which we may look beyond the relevant statute to determine whether a state has waived sovereign immunity by participating in a federal program.  Here, neither the RSA's implementing regulations nor the RSA Arbitration Policies contain any mention of money damages, and the parties have not provided us with any other material that sheds light on the terms of ODRS's participation in the RSA Program.

Under these circumstances, ODRS has not waived its sovereign immunity to a damages award from an RSA arbitration panel. *But see Del. Dep't of Health & Soc. Servs.,* 772 F.2d at 1138 (pre-*Sossamon* decision holding that a state waives sovereign immunity when, "after full notice of the Act's requirements, one of which [is] an agreement to arbitration, it voluntarily ma[kes] application with [DOE] to participate in the Randolph-Sheppard program" and that such a waiver extends to damages).

c. *Award of attorney fees to Mr. Altstatt*

Under the APA, the reviewing court must "hold unlawful and set aside agency action," 5 U.S.C. § 706(2), that is "in excess of statutory jurisdiction, authority, or limitations," *id.* § 706(2)(C). ODRS contends the Panel exceeded its remedial authority under the RSA in awarding attorney fees to Mr. Altstatt. We agree and hold the award should be vacated.

We begin with legal background on the "American Rule" regarding the recovery of attorney fees in civil litigation and its application to administrative proceedings. We then proceed to analyze whether the American Rule bars the Panel's attorney fee award and conclude that it does.

i. Legal background

"Our basic point of reference when considering the award of attorney's fees is the bedrock principle known as the American Rule: Each litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise." *Baker Botts L.L.P. v. ASARCO LLC*, 135 S. Ct. 2158, 2164 (2015) (quotations omitted); *see also Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247 (1975). "The American Rule

48

has roots in our common law reaching back to at least the 18th century, and statutes which invade the common law are to be read with a presumption favoring the retention of long-established and familiar legal principles." *Baker Botts*, 135 S. Ct. at 2164 (alterations, citations, and quotations omitted). Courts therefore "will not deviate from the American Rule absent explicit statutory authority." *Id.* (quotations omitted).

"[The Supreme Court] ha[s] recognized departures from the American Rule only in 'specific and explicit provisions for the allowance of attorneys' fees under selected statutes.'" *Id.* (quoting *Alyeska Pipeline*, 421 U.S. at 260). "Although these [departures] take various forms, they tend to authorize the award of 'a reasonable attorney's fee,' 'fees,' or 'litigation costs,' and usually refer to a 'prevailing party' in the context of an adversarial 'action.'" *Id.* (citations and quotations omitted).

Although this court has not addressed the American Rule's application to administrative proceedings, the D.C. Circuit has held that it applies equally in that context. *See Unbelievable, Inc. v. NLRB*, 118 F.3d 795, 806 (D.C. Cir. 1997) ("The American Rule is deeply rooted in our history and in congressional policy. Therefore, we may not lightly allow an administrative agency, any more than a court, to depart from the Rule . . . ." (citation and quotations omitted)).

ii. Analysis

The Panel exceeded its remedial authority under the RSA in awarding attorney fees to Mr. Altstatt. We agree with the D.C. Circuit that the American Rule applies in administrative proceedings, and we see no reason to depart from it here. The RSA's text makes no mention of attorney fees, litigation costs, prevailing parties, or other related

49

terms. Indeed, the statute is wholly silent as to what relief an arbitration panel may grant an aggrieved blind vendor, and it provides only that "the decision of such panel shall be final and binding on the parties" and "subject to appeal and review as a final agency action." 20 U.S.C. §§ 107d-1(a), 107d-2(a).[26] The RSA is thus insufficiently explicit to authorize arbitration panels to award attorney fees to aggrieved blind vendors who prevail in arbitration against their SLA.

## III. CONCLUSION

The Panel complied with the APA when it determined that the ODRS violated the RSA by awarding the Contract to Mr. Brown despite his tax delinquency. It acted within its authority under the RSA and complied with the APA when it determined that Mr. Altstatt should have received the Contract assignment and ordered that Mr. Altstatt replace Mr. Brown as the Contract vendor.

The Panel violated state sovereign immunity when it awarded damages to Mr. Altstatt and against ODRS, and it exceeded the scope of its remedial authority when it awarded attorney fees to Mr. Altstatt and against ODRS.

We therefore affirm the district court's decision upholding the Panel's determination that the ODRS violated the RSA by awarding the Contract to Mr. Brown and its order to replace Mr. Brown with Mr. Altstatt as the Contract vendor. We reverse

---

[26] DOE's implementing regulations and the RSA Arbitration Policies likewise do not enumerate what relief may be granted, and the parties have not provided us with any other materials relevant to the American Rule's application.

the district court's judgment as to the Panel's award of damages and attorney fees and

remand for further proceedings consistent with this opinion.