RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 21a0016p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

STATE OF OHIO, Opportunities for Ohioans with Disabilities, Bureau of Services of Visually Impaired, Business Enterprise Program,

*Petitioner-Appellee,*

*v.*

UNITED STATES DEPARTMENT OF EDUCATION, et al.,

*Respondents,*

JAMES CYRUS,

*Intervenor-Appellant.*

No. 19-3397

─────────────────

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:17-cv-00873—Edmund A. Sargus, Jr., District Judge.

Argued:  February 6, 2020

Decided and Filed:  January 25, 2021

Before:  BATCHELDER, STRANCH, and NALBANDIAN, Circuit Judges

─────────────────

## COUNSEL

**ARGUED:**  Paul T. Belazis, MALONE, AULT & FARELL, Toledo, Ohio, for Appellant. Katherine J. Bockbrader, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.  **ON BRIEF:**  Paul T. Belazis, MALONE, AULT & FARELL, Toledo, Ohio, for Appellant.  Katherine J. Bockbrader, Charissa Payer, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.  Franklin J. Hickman, HICKMAN & LOWDER CO., L.P.A., Cleveland, Ohio, for Amici Curiae.

---

**OPINION**

---

NALBANDIAN, Circuit Judge.  To participate in a program that provided opportunities to blind vendors under federal and state law, James Cyrus signed a contract with a state agency establishing vending facilities.  As a condition of participating in the program, he agreed to pay commissions to state and county facilities in Ohio.  But everything changed after the Ohio Attorney General issued a formal opinion finding the commissions paid to state facilities illegal.  Cyrus stopped making those payments and sought damages from a state agency for about a half-million dollars in commissions he had paid both to a state facility and to county facilities.  The state agency rejected his arguments.  But a federal arbitration panel agreed with Cyrus and awarded him damages, attorneys' fees, and prospective relief.

The State sought review of the arbitration order by suing in federal court.  And the district court mainly ruled in the State's favor.  Cyrus now appeals.  He urges us to overturn the district court's decision and reinstate his damages awards and prospective relief.  Because we believe that the district court got it right except as to prospective relief for the commissions charged by counties, we **AFFIRM** in part and **REVERSE** in part.

**I.**

Congress enacted the Randolph-Sheppard Vending Stand Act  (RSA) in 1936 to "provid[e] blind persons with remunerative employment, enlarg[e] the economic opportunities of the blind, and stimulat[e] the blind to greater efforts in striving to make themselves self-supporting."  20 U.S.C. § 107(a).  To achieve its goal, Congress authorized blind persons to "operate vending facilities on any Federal property."  *Id.*  Congress also authorized the Department of Education Secretary to "prescribe regulations" to carry out and enforce the RSA. *Id.* § 107(b).  And Congress required the Secretary to "[d]esignate [in each State] . . . the State agency" that meets the Secretary's requirements and that will issue licenses to blind persons operating those vending facilities "on Federal and other property in such State."  20 U.S.C. §§ 107a(a)(5), 107b; *see* 34 C.F.R. § 395.3.

Like other states, Ohio has enacted parallel legislation (Ohio's "mini-RSA") to expand the RSA's priority for blind merchants to state properties. *See* 33 Ohio Rev. Code §§ 3304.28–3304.35. It created its own state agency, Opportunities for Ohioans with Disabilities (OOD), to set up the state's blind vendor program (the Business Enterprise Program). *Id.* § 3304.12. It also designated Ohio's Bureau of Services for the Visually Impaired (BSVI), a division of OOD, to implement the RSA and mini-RSA. *Id.* §§ 3304.28–3304.29. As part of its responsibilities, BSVI licenses blind persons to operate vending facilities on the state's "governmental property"—"any real property, building, or facility owned, leased, or rented by the state or any board, commission, department, division, or other unit or agency thereof." *Id.* §§ 3304.28(C), 3304.29(C).

The BSVI acts as a middleman by creating two different kinds of contracts. The first kind—the Bureau-Grantor agreement—establishes a property or facility as part of the RSA program and defines the terms for granting use of the facility for RSA vending. *See* Ohio Admin. Code 3304:1-21-01(G). The second kind—the Bureau-Operator agreement—brings a blind vendor into the program and defines the terms for operating an RSA facility. *Id.* at 3304:1-21-01(F).

The RSA also sets up a two-tiered scheme for resolving vendors' grievances that result from the state agency's actions carrying out the RSA program. The state agency must first hear and decide the grievance. 20 U.S.C. § 107d-1(a). A vendor dissatisfied with the agency's decision may then request arbitration (RSA arbitration) by a federal panel convened by the Department of Education (RSA panel). *Id.* That arbitration decision is a final agency action subject to judicial review under the Administrative Procedure Act. *Id.* § 107d-2; *see* 5 U.S.C. §§ 701–706.

James Cyrus is a blind vendor who has participated in the RSA program in Ohio since July 1989. Since then, he has operated facilities in Ohio under the program, including one at the University of Toledo (a state university in Toledo, Ohio) and others in Lucas County, including at the Lucas County Corrections Center. (*Id.* at 1576–79.) To participate in the program, he signed a Bureau-Operator Agreement that required Cyrus to comply with the terms of the Bureau-Grantor Agreement at any place where he operated a vending facility. BSVI's Bureau-

Grantor Agreements with both Lucas County and the University of Toledo required vendors to pay commissions directly to the grantors—the university and the county. *Ohio v. U.S. Dep't of Educ.*, 377 F. Supp. 3d 823, 827–28 (S.D. Ohio 2019). So because his Bureau-Operator Agreement effectively incorporated the terms of the Bureau-Grantor Agreements, Cyrus had to pay commissions to both grantors. Cyrus estimates that he has paid $504,000 in commissions as a licensed RSA vendor. *Ohio*, 377 F. Supp. 3d at 828.

In March 2014, the Ohio Attorney General (AG) issued a formal opinion on the legality of conditioning RSA-vending opportunities at state or state-affiliated universities on commission payments. He found them illegal after concluding that "BSVI has no authority, under current statutes or rules, to collect commission payments based on the sales of a vending facility from a blind vendor and pay those commissions to a college or university." (R. 20-27, AG Opinion, PageID 2412 (explaining that those commissions "contravene[] the letter and spirit of the pertinent state and federal laws").) But he distinguished "set-aside" payments—funds "set aside, or caused to be set aside, from the net proceeds of the operation of the vending facilities" for enumerated purposes—as legal. § 107b(3).

Based on that opinion, Cyrus filed a grievance against BSVI challenging all the commission payments and stopped making payments to the University of Toledo. *Ohio*, 377 F. Supp. 3d at 828. He did not, however, stop paying commissions to Lucas County. BSVI contacted the University of Toledo, stating that based on the AG's opinion, "OOD believes the [contractual] requirement . . . to pay commissions is void and can no longer be part of the agreement." (R. 20-49, Letter, PageID 2703.) On that basis, BSVI denied Cyrus's grievance but took no action on the Lucas County commissions. Cyrus then requested a state administrative hearing, but the hearing officer denied relief. *See Ohio*, 377 F. Supp. 3d at 829; §§ 107b(6), 107d-1. BSVI adopted the hearing officer's recommendation.

Unsatisfied, Cyrus filed an arbitration complaint with the Secretary under the RSA's grievance procedures. *See Ohio*, 377 F. Supp. 3d at 829; §§ 107d-1, 107d-2. Cyrus maintained the illegality of the compelled commission payments at all RSA-vending sites (including Lucas County) under both the RSA and the State's mini-RSA. *Ohio*, 377 F. Supp. 3d at 829. On those grounds, he sought compensatory damages for all illegally imposed commission payments,

monetary damages for losses, declaratory and injunctive relief, interest, and attorneys' fees and costs. *Id.* at 829–30.

The divided RSA panel found in Cyrus's favor. It found that BSVI breached its duties by requiring commission payments to both the University of Toledo and Lucas County in violation of the RSA and the mini-RSA. For that violation, the panel awarded Cyrus "an award in the amount of commissions [] paid under the . . . Bureau-Operator Agreement to the University of Toledo and to Lucas County" to be paid by the state. (R. 20-43, Panel Decision, PageID 2661.) It also awarded Cyrus prospective relief—enjoining the BSVI from compelling Cyrus to pay commissions under the Bureau-Grantor agreements and preventing the agency from taking any adverse action against Cyrus for nonpayment of those commissions. And it awarded Cyrus pre- and post-judgment interest as well as attorneys' fees.

Seeking review of the arbitration decision, BSVI sued. *See* § 107d-2 (subjecting the RSA panel's decision "to appeal and review as a final agency action for purposes of" 5 U.S.C. § 706). Before the district court, BSVI raised three arguments:

> First, the monetary damages award was improper because sovereign immunity applies to Article I proceedings and the State did not waive it. Second, attorney fees are barred by sovereign immunity or are otherwise unavailable under the [RSA]. Third, . . . the Panel's decision was "arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law."

*Ohio*, 377 F. Supp. 3d at 830 (citations omitted). In response, Cyrus moved to enforce the panel's award and opposed BSVI's arguments before the district court. *Id.*

After reviewing the arguments, the district court granted in part and denied in part BSVI's arguments as well as granted in part and denied in part Cyrus's motion to enforce the panel's decision. Because it found the Eleventh Amendment barred the panel's award of damages and attorneys' fees against BSVI, the court overruled that part of the panel's decision. *Id.* at 838, 842. It also agreed with BSVI and found improper the panel's decision to award prospective relief against commissions required under agreements with county-grantors. *Id.* at 841. But it found the panel's decision to award Cyrus prospective relief "enjoining grantors on state colleges or universities from charging commission payments" proper. *Id.* at 840. Cyrus appeals.

## II.

When reviewing an administrative agency's final decision under the APA, we review the district court's decision de novo. *Latin Am. for Soc. and Econ. Dev. v. Admin. of the Fed. Highway Admin.*, 756 F.3d 447, 462 (6th Cir. 2014). We "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action" and "hold unlawful and set aside agency action, findings, and conclusions found to be"—among other prohibitions—"not in accordance with law" or "contrary to constitutional . . . immunity." § 706, 706(2)(A)–(B). We also "accept the agency's factual findings if those findings are supported by substantial evidence on the record as a whole." *Ky. Waterways All. v. Johnson*, 540 F.3d 466, 473 (6th Cir. 2008) (quoting *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992)).

Cyrus makes four main arguments on appeal. First, he argues the district court erred when it found that BSVI may legally charge blind vendors commissions for operating on county facilities. Second, Cyrus urges us to find that the Eleventh Amendment does not bar the RSA panel from imposing liability against BSVI in proceedings brought by private parties. Third, he argues that Ohio waived its immunity, given its prelitigation conduct (submitting itself to final and binding arbitration) and its agreement that all RSA panel decisions are subject to appeal in federal court as a final agency action.[1] Last, he asks us to affirm the RSA panel's award of attorneys' fees.

## A.

The first question that we address is whether the BSVI can enter into agreements that require blind vendors to pay commissions to Ohio counties. BSVI focuses its argument on "priority," emphasizing that blind vendors only get priority on "governmental property" under the state law, and counties are not within the state-law definition of "governmental property." 33 Ohio Rev. Code § 3304.28(C). But that argument is misguided because priority under state

---

[1]Cyrus does not specify whether he contends that Ohio has waived that immunity in adjudications before the federal arbitration panel or in appeals of the panel's decision in federal court. His argument implies that he takes both positions. We accordingly address both.

law does not determine which of its contracts are subject to federal regulations. Rather, the federal RSA and its relevant regulations govern the legality of taking money from blind vendors.

Section 107b governs how State Licensing Agencies (SLAs) execute the program. Section 107b(3) directs that "if any funds are set aside, or caused to be set aside, from the net proceeds of the operation of the vending facilities such funds shall be set aside, or caused to be set aside, only to the extent necessary for and may be used only for" enumerated purposes that do not include commissions. When Section 107b(3) discusses funds that are "set aside, or caused to be set aside," it refers to any money that a SLA collects, whether the facility is on federal property or "other property."[2] This means that any money the SLA collects, including commissions from county property, is subject to the § 107b(3) limitation. Since BSVI's contracts with counties are subject to the federal RSA, the contracts must comply with the limitations on use of funds.

But reading § 107b(3) to apply to SLAs instead of certain types of property does not reduce the force of the fund-collection restriction. Because SLAs always administer the contracts for blind vendors in the state, the SLAs will always be the middlemen between the blind vendors and the property owner, whether state, federal, or local. Thus, any commission collected would require that the SLA itself "set aside, or cause[] to be set aside" that commission. § 107b(3). The structure of the system and relevant federal regulations confirm this. *See, e.g.*, 34 C.F.R. § 395.33(b) ("the appropriate State licensing agency shall be invited to

---

[2]Since 34 C.F.R. § 395.1(n) defines "other property" as non-federal property "on which vending facilities are established or operated by the use of any funds derived in whole or in part, directly or indirectly, from the operation of vending facilities on any Federal property," any property on which an SLA establishes a blind vending facility becomes "other property" because the establishing agency is necessarily funded in part by vending facilities on federal property. This view aligns with other courts' interpretation of the funding system. *See New Hampshire v. Ramsey*, 366 F.3d 1, 6 (1st Cir. 2004) (noting that states receive funding from vending facilities on federal property and can use those funds for various program costs); *Tamashiro v. Dep't of Human Servs.*, 146 P.3d 103, 116 (Haw. 2006) (noting that receiving these funds makes the federal RSA provisions apply to non-federal property).

As the Arbitration Panel correctly explained: "The Bureau receives both unassigned income from federal facilities, as well as set aside funds from federal, state, county and municipal facilities. These funds are intermingled and used to operate the Ohio's Business Enterprise Program, including the management of the program and establishment and ongoing support of all vending facilities. As such, all blind vending facilities in Ohio are 'established or operated by the use of . . . funds derived in whole or in part, directly or indirectly, from the operation of vending facilities on . . . Federal property.'" (R. 20-43, Majority Arb. Panel Op., PageID 2659–60 (citations removed, ellipses in original).)

respond to solicitations for offers . . .").  Nowhere does the Act grant the federal government, or any other entity, the power to collect funds from blind vendors.[3]  So a provision restricting collection need only apply to the SLA to be fully effective.

The rest of the statutory text supports our reading as well.  Section 107, though entitled "Operation of vending facilities," appears to outline rules for facilities on "Federal property" only. *See* §§ 107(a), (b).  Section 107(b) starts by specifying that it applies to "authorizing the operation of vending facilities on Federal property."  Also, § 107(a) refers specifically to "Federal property." And the "[a]ny limitation" portion of § 107(b) refers only to the "interests of the United States," not to any state involved in the program.  Together, these indicate that § 107 is only about federal property, not other property.  The Act itself also seems to contemplate § 107b(3) as the source of fund-collection restrictions.  Section 107a(a)(1) tasks the Secretary of Education with establishing "requirements for the uniform application of this chapter by each State agency," including "the use and control of set-aside funds under section 107b(3) of this title."

Not every circuit court to address this issue has agreed on which statutory language prohibits commissions.  The Eighth Circuit relied on § 107(b), legislative history, and § 107b(3) together to determine that a federal department could not charge an SLA a commission that the SLA then passed on to the blind vendor.  *State of Minn., Dep't of Jobs & Training v. Riley*, 18 F.3d 606, 609 (8th Cir. 1994).  And other circuit opinions have relied on only the § 107(b) language that no one may put "[a]ny limitation on the . . . operation of a vending facility" without permission from the Secretary of Education. *See Minnesota Dep't of Econ. Sec., State Servs. for the Blind & Visually Handicapped v. Riley*, 107 F.3d 648, 649–50 (8th Cir. 1997); *Kansas v. SourceAmerica*, 826 F. App'x 272, 285–86 (4th Cir. 2020).  Neither of the latter cases,

---

[3]While 34 C.F.R. § 395.32(a) tasks federal officials with collecting "vending machine income from vending machines on Federal property," the statute clarifies that this does not include income from blind licensees. 20 U.S.C. § 107e(8).

however, dealt with commissions specifically. And none of these cases addressed the statutory structure we rely on today in our reading of the fund collection restrictions.[4]

Finally, BSVI argues that the commissions paid to counties do not violate Section 107b(3) because it does not pay the commissions from the "set-aside funds" that it collects. Since the vendors pay the counties directly, it is technically true that BSVI never pays counties with set-aside funds. This argument, however, ignores the fact that BSVI cannot "cause[] to be set aside" funds except "to the extent necessary for and . . . used only for" the enumerated purposes. § 107b(3). BSVI cannot cause a county, by operation of the agreements that it enters into, to collect the money for impermissible reasons any more than it can directly fund such purposes.[5]

We conclude that the RSA prohibits commissions in the contracts with blind vendors, even for facilities on county-owned properties. Thus, prospective relief was appropriate.

## B.

As for sovereign immunity, we first examine whether it applies to the RSA panels at all before asking if the state consented to the arbitration. To address the Eleventh Amendment questions, we must revisit precedent—the Supreme Court's and ours. As part of their entering into the social contract under the nation's Constitution, states gave up *some* of their inherent immunity from suits brought by select parties. *Fed. Mar. Comm'n v. S.C. Ports Auth.*, 535 U.S. 743, 752 (2002) ("*FMC*"). But each state also retained its "residuary and inviolable sovereignty" and remained immune from private suits. *Id.* at 751 (quoting The Federalist, No. 39, p. 245 (C. Rossiter ed. 1961) (J. Madison)). Congress later enacted the Eleventh Amendment to clarify that immunity in response to *Chisholm v. Georgia*, 2 U.S. 419 (1793). *Id.* at 752.

---

[4]Also, we note that the facilities at issue in *Riley* were on "Federal property." 107 F.3d at 649. So if the "any limitation" restriction in § 107(b) is the main source of the prohibition on commissions in that case, it could not complete our analysis of county property here, given our interpretation of § 107 as applying to federal property only.

[5]BSVI points out that the Secretary defines "set-aside funds" as "funds which accrue to a State licensing agency from an assessment against the net proceeds of each vending facility in the State's vending facility program." 34 C.F.R. § 395.1(s). But the agency's definition of the noun "set-aside funds" does not alter our construction of the verb phrase used in the statute—"such funds shall be set aside, or caused to be set aside," 20 U.S.C. § 107b(3)—which is unambiguous. *See Sandusky Wellness Ctr., LLC v. Medco Health Sols., Inc.*, 788 F.3d 218, 223 (6th Cir. 2015).

This Court has ruled that the Eleventh Amendment does not apply in proceedings before a federal arbitration panel convened under the RSA. *See Tenn. Dep't of Human Servs. v. U.S. Dep't of Educ.*, 979 F.2d 1162 (6th Cir. 1992) ("*T-DHS*"). In *T-DHS*, an RSA panel awarded a blind vendor retroactive damages from the state agency as well as interest and attorneys' fees, *id.* at 1165, but the reviewing district court ruled for the agency based on Eleventh Amendment immunity, *id.* On appeal, the *T-DHS* panel held that the Eleventh Amendment "applies to Article III" and not Article I proceedings. *Id.* at 1166–67 (reasoning that "the fundamental principle of sovereign immunity limits the grant of *judicial authority in Art. III*" (quoting *Pennhurst State Sch. v. Halderman*, 465 U.S. 89, 98 (1984))). On that basis, it found that the RSA panel's award for retroactive damages against state agencies did not violate the Eleventh Amendment. *Id.* Still, the *T-DHS* panel held that sovereign immunity did apply when "a private party who wins an arbitration award petitions an Article III court for enforcement of the award." *Id.* at 1167. Because the RSA's text "reflects neither an unmistakable intention by Congress to abrogate the states' sovereign immunity nor a clear statement that participation in the program will constitute a waiver of immunity," the court found that the RSA did not abrogate states' sovereign immunity in federal court. *Id.* at 1168.

After this court decided *T-DHS*, however, the Supreme Court found that the Eleventh Amendment *could* apply in Article I proceedings. The Court specifically resolved "whether the sovereign immunity embedded in our constitutional structure and retained by the States when they joined the Union extends to FMC [Federal Maritime Commission] adjudicative proceedings." *FMC*, 535 U.S. at 754 (explaining that its assumption that the FMC does not exercise "the judicial power of the United States" does not end the sovereign immunity inquiry). To resolve that issue, the Court first noted that it had in the past "applied a presumption . . . that the Constitution was not intended to 'raise up' any proceedings against the States that were 'anomalous and unheard of when the Constitution was adopted.'" *Id.* at 755 (original alterations omitted) (quoting *Hans v. Louisiana*, 134 U.S. 1, 18 (1890)).

The Court then "examine[d] FMC adjudications to determine whether they are the type of proceedings from which the Framers would have thought the States possessed immunity when they agreed to enter the Union." *Id.* at 756. Doing so, the Court found that "the similarities

between FMC proceedings and civil litigation are overwhelming." *Id.* at 757–59 (remarking that the parties agreed the agency's adjudication "walks, talks, and squawks very much like a lawsuit" (quoting *S.C. State Ports Auth. v. Fed. Mar. Comm'n*, 243 F.3d 165, 174 (4th Cir. 2001))). The Court looked at the role of the administrative law judge, the procedural and discovery rules, and the coercive nature of the proceeding.

The role of the administrative law judge and that of an Article III judge are "functionally comparable." *Id.* at 756 (quoting *Butz v. Economou*, 438 U.S. 478, 513 (1978)). For example, the FMC ALJ "has the authority to 'arrange and give notice of hearing'" where she may, among other things, "rule upon offers of proof and dispose of any other matter that normally and properly arises in the course of proceedings." *Id.* at 758–59 (original alteration omitted) (quoting 46 C.F.R. § 502.147 (2001)). That ALJ also "issues a decision that" looks much like a court opinion and that "becomes the final decision of the FMC unless a party . . . appeals to the Commission or the Commission decides to review the ALJ's decision." *Id.* at 759 (noting that the decision is to include "a statement of findings and conclusions, as well as the reasons or basis therefor, . . . the appropriate rule, order, section, relief, or denial thereof" (quoting § 502.223)).

Also, the FMC's rules governing pleadings mimic the Federal Rules of Civil Procedure. *Id.* at 757. The Court noted the fact that a case before the agency "is commenced by the filing of a complaint," that the defendant "must file an answer" within a predetermined period, and that the defendant "may also file a motion to dismiss." *Id*. Other similarities include intervention and default judgment rules. *Id*. The Federal Rules of Evidence even apply unless they conflict with the Administrative Procedure Act or the FMC's own rules. *Id.* at 759 n.10 (quoting § 502.156). And discovery in the agency's adjudications "largely mirrors discovery in federal civil litigation." *Id.* at 758.

Finally, the proceedings in *FMC* are coercive, similar to an Article III proceeding.**[6]** *FMC*, 535 U.S. at 761–64. The Court noted that any state not appearing before the FMC would

---

**[6]**Cyrus conflates the questions of whether a proceeding is *coercive* (and thus similar to an Article III court) and whether attending a proceeding is *coerced* (meaning that the state did not consent to the suit). When the *FMC* Court discussed coercion, it did so in describing how an adjudication could be like an Article III case even though the Commission's orders were "not self-executing." *FMC*, 535 U.S. at 761. And as the Court noted, a state's

be subject to the Commission's decision—including in later enforcement actions by the United States where sovereign immunity would not apply. *Id.* at 762–63. The Court concluded that this dilemma—to "appear before the Commission . . . or stand defenseless" to later enforcement— made the proceeding coercive. *Id.* at 762–64.

The Court then discussed the primary purposes behind sovereign immunity— "accord[ing] States the dignity that is consistent with their status as sovereign entities" and providing "an immunity from suit." *Id.* at 760 (describing this as the "preeminent purpose of state sovereign immunity"), 766; *see also id.* at 769 ("[T]he relief sought by a plaintiff suing a State is irrelevant to the question whether the suit is barred by the Eleventh Amendment." (quoting *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 58 (1996))). It explained that the Framers "thought it 'neither becoming nor convenient'" to "summon[] [States] as defendants to answer the complaints of private persons." *Id.* at 760 (quoting *Alden v. Maine*, 527 U.S. 706, 748 (1999)).

"Given both this interest in protecting States' dignity and the strong similarities between FMC proceedings and civil litigation," the Court "h[e]ld that state sovereign immunity bars the FMC from adjudicating complaints filed by a private party against a nonconsenting State." *Id.* In other words,

> [I]f the Framers thought it an impermissible affront to a State's dignity to be required to answer the complaints of private parties in federal courts, we cannot imagine that they would have found it acceptable to compel a State to do exactly the same thing before the administrative tribunal of an agency, such as the FMC.

*Id.* And the Court suggested that permitting a private party to "haul a State" before an administrative tribunal even more greatly insults a State's dignity. *Id.* at 760 n.11.

Despite *FMC*, Cyrus urges us to find that *T-DHS* controls the outcome and that the Eleventh Amendment does not bar the arbitration panel from awarding damages against BSVI. While not contesting the fact that *FMC* overruled *T-DHS*'s broad holding, Cyrus observes differences between the RSA arbitrations and the proceedings in *FMC*: RSA arbitrations

---

consenting to suit would not make the proceeding no longer coercive, but rather would make the coercion "permissible." *Id.* at 764. Coercion and consent are two separate inquiries.

proceed before ad hoc panels, *see* § 107d-2(b)(1), the RSA panel does not require the state file an answer, and failure to answer does not lead to default.  But he fails to show that RSA arbitrations are so unlike civil proceedings that they fall outside the logic of *FMC*.

The only court of appeals that has examined this question thus far has found RSA arbitrations sufficiently like civil litigation to satisfy *FMC*. *See Tyler v. United States Dep't of Educ. Rehab. Servs. Admin.*, 904 F.3d 1167, 1188–90 (10th Cir. 2018).  That court noted several shared characteristics of RSA arbitrations and Article III proceedings, including their adversarial nature; their use of evidence, including oral and documentary, transcripts of testimony, exhibits, and pleadings; and the requirement of a rationale for the findings and conclusions.  *Id*. at 1188.  And just like FMC proceedings, a state can choose to either appear to defend itself or lose all rights to argue the merits on appeal.  *Id*. at 1191–92.  *Tyler* also addressed differences between the two, which it concluded did not materially distinguish them:  that RSA proceedings are not necessarily decided by a "federal officer" and do not carry subpoena power; that complaints can be screened without arbitration; that there is no provision for default if the SLA does not respond; and that the governing rules are less formal.

We find the Tenth Circuit's reasons for overlooking these differences persuasive.  For one, RSA's ad hoc panels have the "protections from political influence" necessary to support their impartial use of "independent judgment on the evidence."  *Id*. at 1190 (quoting *FMC*, 535 U.S. at 756.)  Second, RSA panels have powers comparable to a trial judge's powers, such as arranging and regulating hearings.  *Id*. at 1190–91.  Third, an RSA panel's ability to screen cases mirrors a federal judge's power to dismiss a meritless case sua sponte.  *Id*.  Fourth, the fact that there are no default judgments does not obviate the state's need to defend itself in the RSA proceedings to avoid "substantially compromis[ing] its ability to defend itself at all."  *Id*. (quoting *FMC*, 535 U.S. at 762).  Finally, the Tenth Circuit concluded that the less formal nature of RSA arbitrations was not extreme enough to negate their strong resemblance to civil litigation. Altogether, these attributes make RSA arbitration panels enough like civil litigation in Article III courts to bring them under the logic of *FMC*. We therefore hold that sovereign immunity applies in RSA proceedings.

**C.**

Having decided that sovereign immunity applies to the arbitrations, we next ask whether and to what extent Ohio consented to adjudication before the federal arbitration panels under the RSA. Unlike in *FMC*, Ohio (and correspondingly, BSVI) voluntarily participates in the RSA program and in proceedings before the federal arbitration panel. *See* §§ 107d-1(a), 107d-2(a). So BSVI is not entirely immune to suit in that forum. Simply because BSVI has consented or waived its immunity to suit in that forum, however, does not require a finding that BSVI waived its sovereign immunity to retroactive damages imposed by that forum. *See Alden*, 527 U.S. at 758; *Lane v. Peña*, 518 U.S. 187, 192 (1996); *Hoffman v. Conn. Dep't of Income Maint.*, 492 U.S. 96, 101–02 (1989) (plurality opinion). We find Ohio has not waived its immunity from RSA damages awards imposed by federal arbitration panels.

The Supreme Court's discussion in *Sossamon v. Texas*, 563 U.S. 277 (2011), is most on point. The Court in that case addressed whether the states, by accepting federal funds, had waived immunity to suits for money damages under the Religious Land Use and Institutionalized Persons Act of 2000, 114 Stat. 803, 42 U.S.C. § 2000cc, *et seq.* (RLUIPA). *Sossamon*, 563 U.S. at 280. An inmate sued the State of Texas and prison officials in their official capacities under RLUIPA's express cause of action—"[a] person may assert a violation of RLUIPA as a claim or defense in a judicial proceeding and obtain appropriate relief against a government"—and sought injunctive and monetary relief. *Id.* at 282 (original alteration omitted) (quoting § 2000cc-2(a)). The Court acknowledged that a State may consent to suit and "waive[] [its] sovereign immunity to other types of relief" and "not waive [its] immunity to damages." *Id.* at 285. It found RLUIPA fit that bill. RLUIPA "is susceptible of multiple plausible interpretations," one that authorizes private suits against a State for damages and one that does not. *Id.* at 287. The statute accordingly did not have the "clear declaration" required to indicate States "in fact consent[ed]" to those suits. *Id.* at 284 (quoting *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 680 (1999)). So while RLUIPA's terms created a private cause of action, the Court found that RLUIPA's text "does not include suits for damages against a State." *Id.* at 288.

The RSA includes language even more ambiguous than RLUIPA. It authorizes "blind licensee[s] . . . dissatisfied with any action arising from the operation or administration of the

vending facility program . . . [to] submit to a State licensing agency a request for a full evidentiary hearing." § 107d-1(a). If that licensee remains dissatisfied with the agency's decision, "he may file a complaint with the Secretary who shall convene a panel to arbitrate the dispute pursuant to section 107d-2 . . . and the decision of such panel shall be final and binding on the parties except as otherwise provided in this chapter." *Id.* And § 107d-2 dictates that the "ad hoc arbitration panel['s decision] . . . shall be subject to appeal and review as a final agency action for purposes of chapter 7 of such Title 5" (§ 706 of the APA). *Id.* § 107d-2(a).

The RSA does not mention any type of available remedy, only that RSA panels have jurisdiction over complaints coming from state agency decisions and the effect of those panels' decisions ("final and binding on the parties"). And the RSA does not make an explicit statement that comprehensively waives *any* immunity States would otherwise retain. *See, e.g.*, *Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 303 (1990) (waiving immunity "of *any* form or nature at law, in equity *or otherwise*" (emphasis added)). So although Ohio voluntarily participates in the RSA program and in RSA arbitrations, and agrees that RSA panels' decisions are "final and binding on the parties," it has "not waive[d] [its] immunity to damages" awarded by those panels.[7]

The panel thus exceeded its authority when it awarded Cyrus damages, prejudgment interest, and post-judgment interest; its decision is "contrary to constitutional . . . immunity." § 706. We affirm the district court's decision overruling the panel majority.

---

[7]This conclusion seems to be in tension with the *T-DHS* panel's finding that the RSA's text authorizes RSA panels to award retroactive damages. 979 F.2d at 1165. But *T-DHS* did not have the benefit of *Sossamon* or *FMC*. The *T-DHS* panel found sovereign immunity simply did not apply to Article I adjudications, so it never evaluated § 107d-1(a) in the context of whether it amounted to a waiver of immunity. And *T-DHS*'s finding that § 107d-2(a) "reflects neither an unmistakable intention by Congress to abrogate the states' sovereign immunity nor a clear statement that participation in the program will constitute a waiver of immunity" in federal courts is telling. *Id.* at 1168.

So that part of *T-DHS*—that the RSA's text authorizes RSA panels to award retroactive damages—does not control our resolution on the extent of the waiver in § 107d-1(a); *T-DHS* never addressed that question and left us to resolve it in the first instance. And we note that the other courts of appeals that have resolved this question after *Sossamon* have reached the same conclusion as we do here. *See Tyler*, 904 F.3d at 1192–93; *cf. Ramsey*, 366 F.3d at 21–22 (describing this as "[a]t best . . . [a] disagreement as to whether the R-S Act arbitration panels can award damages" in the context of evaluating "whether Congress intended in" another statute "to subject states to damages awards for violations found in R-S grievance procedures").

Given that sovereign immunity bars RSA panels from issuing decisions that award damages in private suits, a private party could not possibly enforce that decision in federal court. So we need not address Cyrus's arguments that under § 107d-2(a), Ohio has waived its immunity to enforcement of the panel's damages awards in federal court.

**D.**

Finally, Cyrus challenges the district court's decision to reject the RSA panel's attorneys' fees award. Although the trial court granted prospective relief for the commissions paid to state agencies (and we now believe similar relief is also appropriate for commissions paid to counties) and agreed that attorneys' fees are permitted under the RSA, it rejected the attorneys' fees award on sovereign immunity grounds. Cyrus now argues that: (1) *FMC* does not affect the holding in *T-DHS* that RSA panels can award attorneys' fees, and (2) attorneys' fees may be awarded against a state as an ancillary component of prospective relief without implicating the state's sovereign immunity. We reject the first argument for the same reasons we reject Cyrus's claim to damages, and we decline to address the second.

The federal RSA does not provide for—or even mention—attorneys' fees. *See Tyler*, 904 F.3d at 1194 ("The RSA's text makes no mention of attorney fees, litigation costs, prevailing parties, or other related terms."). And the American Rule dictates that "absent statute or enforceable contract, litigants pay their own attorneys' fees." *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 257 (1975). The American Rule is the "basic point of reference" and "bedrock principle" for determining allocation of fees in our system. *Peter v. NantKwest, Inc.*, 140 S. Ct. 365, 370 (2019) (quoting *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 252 (2010)). Its roots stretch back to the 18th Century, and courts should "not deviate from the American Rule 'absent explicit statutory authority.'" *Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121, 126 (2015) (quoting *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 602 (2001)). The Supreme Court "has never suggested that any statute is exempt from the presumption against fee shifting." *Peter*, 140 S. Ct. at 371.

Cyrus notes that the *T-DHS* panel, though ultimately rejecting a fee award on Eleventh Amendment grounds, broadly stated that the American Rule did not apply to RSA proceedings. The American Rule, it concluded, applied only "to the awarding of attorneys' fees to parties that have litigated their cause *in the federal courts,*" suggesting that non-court tribunals are free to award fees regardless of the statute at issue. *T-DHS*, 979 F.2d at 1169. Thus, for *T-DHS*, the nature of the proceeding was the dispositive factor, not the statutory language.

But that analysis flies in the face of Supreme Court precedent both before and after *T-DHS*. For example, in *Summit Valley*, the Supreme Court applied the American Rule to fees incurred for proceedings before the National Labor Relations Board. *Summit Valley Indus. Inc. v. Loc. 112, United Brotherhood of Carpenters & Joiners of Am.*, 456 U.S. 717, 727 (1982). Emphasizing that the American Rule "has been consistently followed for almost 200 years," the Supreme Court searched the statute for the "express congressional authority" necessary to create an exception to the rule. *Id.* at 721, 724. Finding no authorization for attorneys' fees in the text or implicit in the statutory right to "damages," the Court denied them. *Id*. at 722–27. That decision followed the Court's earlier decision in *Alyeska*, which stated that the focus of the fee inquiry is on whether there is "statutory authorization for such an award." 421 U.S. at 245; *see also Greene Cnty. Plan. Bd. v. Fed. Power Comm'n*, 559 F.2d 1227, 1239–40 (2d Cir. 1976) (en banc) (Federal Power Commission had no authority to award attorneys' fees in connection with administrative hearings absent "appropriate Congressional action.").

The *T-DHS* panel ignored the statute's language and the Court's decision in *Summit Valley*. And as we've said, when a circuit panel overlooks a Supreme Court ruling, we are bound to "discharg[e] our duty to follow clearly controlling Supreme Court precedent" rather than the holding in a decision of our court that failed to acknowledge the relevant Supreme Court precedent. *The Ne. Ohio Coal. for the Homeless v. Husted*, 831 F.3d 686, 720 (6th Cir. 2016) (quoting *Tucker v. Phyfer*, 819 F.2d 1030, 1035 n.7 (11th Cir. 1987)). That principle is applicable here, even putting aside whether the *T-DHS* panel's categorical rejection of the American Rule in RSA proceedings was necessary to its holding in that case.

But regardless, shortly after *T-DHS*, the Supreme Court again made clear that American Rule analysis centers on the statute, not the type of proceeding. In *Key Tronic Corp. v. United*

*States*, the Court began with the presumption that "attorney's fees generally are not a recoverable cost of litigation 'absent explicit congressional authorization.'" 511 U.S. 809, 814 (1994) (quoting *Runyon v. McCrary*, 427 U.S. 160, 185 (1976)). It then analyzed the statute to determine whether the American Rule blocked recovery of fees for attorneys' work in negotiating a consent decree. *Id.* at 814–19. After confirming that neither applicable section referenced attorneys' fees, the Court considered whether the statute "otherwise evince[d] an intent to provide for such fees." *Id.* at 815. It concluded that the statute did not, specifically noting that the section lacked an express fee provision despite related sections having such provisions, and that it would be a stretch to include private cost recovery actions in the statute's provision for "enforcement activities" that qualify for attorneys' fees. *Id.* at 818–19.

And the Supreme Court has continued to focus its discussion of the American Rule on statutory language, never suggesting that the nature of the proceedings was relevant, much less dispositive. *See, e.g.*, *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 533–34 (1994) (rejecting the argument that 17 U.S.C. § 505 mandated attorneys' fees as a matter of course); *Buckhannon*, 532 U.S. at 604–05 (holding that the ordinary meaning of "prevailing party" in 42 U.S.C. § 3613(c)(2) and 42 U.S.C. § 12205 allows attorneys' fees only when there is a "material alteration of the legal relationship of the parties."); *Baker Botts*, 576 U.S. at 128 (holding that 11 U.S.C. § 330 did "neither specifically nor explicitly authorize[d]" an attorneys' fees award, but did provide for compensation for services rendered for the bankruptcy administrator); *Peter*, 140 S. Ct. at 372–73 (2019) (holding that the plain text of 35 U.S.C. § 145 does not allow for attorneys' fees in its provision allocating "expenses").

We thus join two other circuits in applying the American Rule to administrative proceedings. *See Tyler*, 904 F.3d at 1193–94 (applying the American Rule to RSA proceedings); *Unbelievable, Inc. v. NLRB*, 118 F.3d 795, 806 (D.C. Cir. 1997) (applying the American Rule to National Labor Relations Board proceedings). Given the Supreme Court's guidance on the American Rule, we leave the prerogative of providing for attorneys' fees in RSA proceedings to Congress. Neither the federal RSA nor Ohio's mini-RSA contains a provision shifting attorneys' fees, and "the efficacy of an exception to the American rule is a policy decision that must be made by Congress, not the courts." *Key Tronic*, 511 U.S. at 819 n.13 (quoting *FMC Corp. v.*

*Aero Indus.,* 998 F.2d 842, 847 (10th Cir. 1993)).[8]  Because the American Rule applies to arbitration panel proceedings, the RSA panel's award of fees was inappropriate.

Because we hold that the American Rule bars attorneys' fees, we need not address whether sovereign immunity bars the fees.  We affirm the trial court's denial of attorneys' fees.

### III.

We **REVERSE** the judgment of the district court denying prospective relief against the charging of commissions by counties, and **REMAND** for entry of judgment ordering that prospective relief.  We **AFFIRM** the judgment of the district court in all other respects.

---

[8]Although *WMA Sec. Inc. v. Wynn* cites *T-DHS* for its analysis of the American Rule in the arbitration panel context, that opinion is unpublished and does not bind this Court.  32 F. App'x 726, 730 (6th Cir. 2002).